NEVADA TAX COMMISSION, Composed of Charles H. Russell, Chairman, Robert A. Allen, D. W. Park, Norman D. Brown, Paul D. McDermott, Gordon Lathrop and W. S. Larsh, Appellants, *v.* MARION B. HICKS, JAMES F. SCHUYLER, CLIFFORD A. JONES, VICTOR B. SAYRE, HARRY BADGER, WILLIAM DEER, JACK LANE, JOE WELLS and L. B. SCHERER, Doing Business as the Thunderbird Hotel Company, a Copartnership, Respondents.

No. 3949

May 3, 1957 310 P.2d 852

*E. Frandsen Loomis; Springer & McKissick,* of Reno, for Appellants.

*Woodburn, Forman, Wedge, Blakey & Thompson,* of Reno; *Harry E. Claiborne,* of Las Vegas, for Respondents.

## OPINION

By the Court, MERRILL, J.:

This matter is before this court on review of action taken by the Nevada Tax Commission. This is an appeal taken by the commission from judgment of the court below setting aside the commission's order suspending the gambling licenses theretofore issued by the state to respondents as partners in the operation of a gambling enterprise.

On February 10, 1955 the commission issued a citation to respondents ordering them to show cause why

their state gambling licenses should not be revoked. Hearing was had on March 30, 1955, and on April 25, 1955 the commission made its findings of fact and conclusions of law and entered its order. It declared respondents Marion B. Hicks and Clifford A. Jones unsuitable to hold gambling licenses and suspended the licenses of all respondents until the two unsuitable licensees had disposed of their partnership interest.

On May 18, 1955 the present action was brought by respondents against the commission seeking an injunction against the enforcement of the suspension order. On that date an order temporarily restraining suspension was issued by the trial court and on June 22, 1955 an injunction against suspension, pendente lite, was issued. Trial was had October 17 and 18, 1955. In the course of trial evidence as to the suitability of Hicks and Jones, not presented to the commission, was received by the trial court over the commission's objection. The commission rested its case upon the record made before it. On December 19, 1955 the trial court rendered its decision in favor of respondents, granting a permanent injunction against enforcement of the suspension order upon the ground that it was not supported by substantial evidence. This appeal was then taken by the commission.

The commission contends: (1) That the trial court erred in receiving new evidence and thus transforming what should have been a review of the commission's action into a trial de novo. (2) That the trial court had no authority to grant an injunction pendente lite. (3) That the suspension order was supported by substantial evidence and should have been affirmed.

It is apparent that this appeal, in general, presents two duties to this court: First, that of fixing the jurisdictional area within which the courts shall act in this field of gambling control; Second, that of proceeding to act within the judicial area so delineated.

We turn to the first of these matters. In this regard statutory language, as hereinafter quoted, is general.

However, against a background of common knowledge, of which we here take note, the legislative intent emerges with clarity.

We note that while gambling, duly licensed, is a lawful enterprise in Nevada, it is unlawful elsewhere in this country; that unlawfully followed elsewhere it tends there to create as well as to attract a criminal element; that it is a pursuit which, unlawfully followed, is conducive of corruption; that the criminal and corruptive elements engaged in unlawful gambling, tend to organize and thus obtain widespread power and control over corruptive criminal enterprises throughout this country; that the existence of organized crime has long been recognized and has become a serious concern of the federal government as well as the governments of the several states.

Throughout this country, then, gambling has necessarily surrounded itself with an aura of crime and corruption. Those in management of this pursuit who have succeeded, have done so not only through a disregard of law, but, in a competitive world, through a superior talent for such disregard and for the corruption of those in public authority.

For gambling to take its place as a lawful enterprise in Nevada it is not enough that this state has named it lawful. We have but offered it the opportunity for lawful existence. The offer is a risky one, not only for the people of this state, but for the entire nation. Organized crime must not be given refuge here through the legitimatizing of one of its principal sources of income. Nevada gambling, if it is to succeed as a lawful enterprise, must be free from the criminal and corruptive taint acquired by gambling beyond our borders. If this is to be accomplished not only must the operation of gambling be carefully controlled, but the character and background of those who would engage in gambling in this state must be carefully scrutinized.

This court has already had occasion to note that the control and licensing of gambling is a duty demanding special knowledge and experience in matters of personnel, operation, and finance, as related to this type of

enterprise. Dunn v. Nev. Tax Com., 67 Nev. 173, 216 P.2d 985. The risks to which the public is subjected by the legalizing of this otherwise unlawful activity are met solely by the manner in which licensing and control are carried out. The administrative responsibility is great.

Against this background of common knowledge we turn to the statutory provisions. The function of the tax commission in gambling control, as applied to the facts of this case, is briefly and generally stated in sec. 10 (b) of the gambling control act in effect at the time these proceedings were initiated. Sec. 3302.18, NCL 1943–1949 Supp., as amended Stats. 1953, ch. 284, pp. 439 and 440 (since superseded by NRS 463.130, 463.140). That section provides, "It is hereby declared to be the policy of this act that all establishments where gambling games are conducted or operated or where gambling devices are operated in the State of Nevada shall be licensed and controlled so as to better protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada, and it is hereby made the duty of the Nevada tax commission to investigate into the legal qualifications of each applicant for licenses under this act before any such license is issued, to the end that licenses shall not be issued to unqualified or disqualified persons or to unsuitable persons or for prohibited places or locations."

The pertinent statutory provision for judicial review is brief. Section 10 (ff) of the gambling control act, in effect at the time these proceedings were initiated, sec. 3302.22a, NCL 1943–1949 Supp. (since superseded by NRS 463.310), deals with the commission's power of revocation and suspension of licenses and provides in part, "Any such revocation or suspension so made shall become and remain effective until reversed or modified by a court of competent jurisdiction upon review."

In this case the suspension order was based upon the ground that two of the individual licensees were not suitable to hold license. We are dealing with the duty

to determine the suitability of those who would secure or retain gambling licenses. This duty the legislature has expressly imposed upon the tax commission. In cases of revocation or suspension the manner in which this duty is carried out is made subject to judicial review.

To accomplish its duty the commission must first define suitability: fix the standards by which it is to judge suitability. Here it acts administratively. Next it must ascertain and examine the facts of the particular case to determine whether its standards have been met. Here, in cases of revocation or suspension where the factual determinations are made after hearing and notice, the commission acts in a quasi-judicial capacity. It is in this respect only, in the usual case, that revocation or suspension is subject to review by the courts. Accord: State ex rel. Grimes v. Board of Com. of Las Vegas, 53 Nev. 364, 1 P.2d 570. It is not the province of the courts to decide what shall constitute suitability to engage in gambling in this state. That is an administrative determination to be made by the commission in the exercise of its judgment based upon its specialized experience and knowledge. Accord: Dunn v. Nev. Tax Com., supra. Whether suitability as defined by the commission exists in the particular case is a question of fact and of evidence, not of administrative ruling. Judgment upon such questions is judgment which the courts are qualified to review.

This is not to say that the administrative determination (as distinguished from the judicial), is wholly exempt from judicial scrutiny. Standards of suitability may be fixed which are so completely unrelated to the subject as to demonstrate that the administrative action of the commission in defining suitability was arbitrary, discriminatory, capricious, or wholly beyond the sphere of its authority. We are not faced with such a situation in this case, however. The only "review" with which we are concerned is the review of the action of the commission in its quasi-judicial capacity.

Since the nature of the court review in such a case as this is limited, the action taken by the commission must make it possible for the courts to respect those limits. It would not do, therefore, for the commission to rule simply that upon all the facts of the case it has concluded that the licensee is unsuitable. A court review of such a determination would require the court itself to fix its own standards of suitability in order to determine whether, upon the proof, such standards have been met. As we shall note later in this opinion, the commission in this case did not make such a general determination. Standards of suitability clearly appear from its decision.

Bearing in mind the distinction between the administrative area and the judicial area we turn to the commission's assignments of error dealing with the nature of the proceedings had in the court below.

This action was treated by the court as an independent and original action in equity. The commission contends that, as such, it must be held a nullity; that the only appropriate method of review can be by certiorari. This, we feel, is going somewhat too far in matters of form. The statutory provision for judicial review, which we have already quoted, is far from specific. It invites improvisation. Its only specification is that judicial action shall be by review. Its only requirement, then, is that whatever the form of judicial proceedings, whether initiated by writ or by complaint, they shall be in the nature of a review.

The commission assigns as error the action of the trial court in admitting evidence bearing upon the issue of suitability which evidence had not been presented to the commission. It contends that this transformed the proceedings below into a trial de novo; that the trial court should, upon review, have confined its consideration to the record made before the commission. Upon this point we concur with the view of the commission.

As stated by Judge Learned Hand in National Broadcasting Co. v. U.S., 47 F.Supp. 940, 946, 947, "[The commission] was created to make such choices because Congress believed that it would acquire in its special sphere a skill which courts could not match; * * *. If [new] evidence went to contradict or overthrow the [commission's] findings we could not bring it into hotchpot with the evidence taken by the Commission, without deciding the issues in the first instance ourselves. We have no such power; it would upset the whole underlying scheme of an expert commission, whose orders must stand or fall upon such evidence as it had before it."

In Utah Copper Company v. Railroad Retirement Board, 41 F.Supp. 763, 766, it was stated, "* * * [T]he purpose for which the defendant Board was created was to have a body which, from its peculiar character and specialized experience, will be most fitted to primarily decide questions such as are raised on this record. Otherwise, as the Court pertinently states * * * the Board would become 'but a mere instrument for the purpose of taking testimony to be suubmitted to the courts for their ultimate action.' "

In referring to the substantial evidence rule James L. Landis states, 53 Harv.L.Rev. 1092, "It evolved naturally as an appreciation arose of the undesirability of trying cases *de novo* in the courts and of the value of having the tribunal, informed by experience, assume a real responsibility for weighing and considering the facts in the fields where it had a peculiar competence."

It should be apparent that if trial de novo is permitted here it would completely destroy the effectiveness of the tax commission as an expert investigative board. The most perfunctory showing could be made before the board by a licensee with knowledge that the matter would ultimately be decided by the courts upon full evidentiary consideration. Trial de novo, in effect, could relegate the commission hearing to a meaningless, formal, preliminary and place upon the courts the full administrative burden of factual determination.

We conclude that upon review of the commission's factual determinations the reviewing court must confine its consideration to the record of evidence made before the commission. The court below was in error in receiving new evidence relative to the suitability of the licensees.

The commission next assigns as error the action of the trial court in granting a temporary restraining order and an injunction pendente lite against enforcement of the suspension order. The commission relies upon the provisions of sec. 10 (ff) of the gambling control act which we have already quoted to the effect that revocation or suspension by the commission "shall become and remain effective until reversed or modified" on judicial review. Respondents, in support of the injunction, contend that this language does not necessarily preclude supersedeas or stay of execution; that if such was the legislative intent it should have been more clearly stated.

We feel the statutory language to be a clear expression of intent that the order become effective forthwith. Substantially the same language was considered by this court in State ex rel. Kassabian v. Medical Examiners, 68 Nev. 455, 235 P.2d 327, 330. There a statute relative to revocation of a license to practice medicine provided that "until the same is modified or reversed, * * * the revocation or suspension or probation of such certificate shall be and become effective" when duly certified. NCL 1943–1949 Supp. sec. 4107.16. The statute was recognized to preclude a stay and was attacked as unconstitutional in that respect. We held the statute constitutional as a legitimate exercise of police power. Certainly the need for close control in matters of gambling, which we have already noted, justifies similar exercise of police power by the legislature.

Our decision upon the evidence, which follows, may be felt to provide support for the contention of respondents to the effect that this is a rule which this very case demonstrates should be abrogated. Without a stay substantial damage may well be suffered before an administrative wrong has been judicially righted. However, the

balancing of private interests against public interests in such matters as this remains the legislative responsibility. Primm v. City of Reno, 70 Nev. 7, 252 P.2d 835. We have already noted that the public interest is great and that the responsibility for its protection is accordingly great.

We conclude that under the statute an injunction against enforcement of the commission's ruling is not available pending judicial review. The temporary injunction in this matter was improperly granted.

Having delineated the area within which the courts shall act in judicial review of commission action, we turn to a review of the commission action in this case. Respondents contend that the suspension order is not supported by substantial evidence. Such was the holding of the court below. As we conceive our appellate function in this type of proceeding it is not to review the determinations of the court below, but to undertake afresh a review of the commission's determinations to ascertain whether, as a matter of law, they are supported by substantial evidence. See Comment, 1 Stanford L.Rev. 326, 329.

The Thunderbird Hotel Company is a partnership engaged in the gambling business in Clark County, Nevada. In this opinion we shall designate it as the gambling partnership. Bonanza Hotel, Inc. is a corporation, owner of the premises known as the Thunderbird hotel in Clark County. In this opinion we shall designate it as the hotel corporation. The gambling partnership operates under a lease from the hotel corporation. The lease is limited to the dining room, bar and gambling casino of the Thunderbird hotel.

There is substantial but not complete identity of those individuals in ownership of the partnership and of the corporation. To a slight degree stock ownership in the hotel corporation is not represented in the gambling partnership. Upon the matter of control, however, there is no question. Respondent Hicks is recognized to control both enterprises, both from point of ownership and, as president, from point of management. Respondent Jones

is a member of the gambling partnership and a stockholder in the hotel corporation. He serves as secretary of both enterprises.

From information available to the members of the commission (including the reports of the United States Senate committee upon organized crime, commonly known as the Kefauver committee) it is apparent that among the figures recognized as prominently active in unlawful gambling beyond the borders of this state and in nationally organized crime are the Lansky brothers, Meyer and Jake (also known as Jack). The former, in particular, is recognized to occupy a position of leadership in organized crime. George Sadlo, whose residence for some time prior to the hearing had been at the Thunderbird hotel, is a close personal friend and gambling associate of Jake Lansky. They have operated together in management of gambling enterprises in Florida. Sadlo and Hicks are close personal friends.

In 1947 Hicks borrowed $160,000 from George Sadlo. The money was borrowed for use by the hotel corporation in the construction of the Thunderbird hotel and was used for that purpose. At the time of the hearing before the commission it appeared that Jake Lansky had shared with Sadlo in the making of this loan. Hicks denied any knowledge of Lansky's participation. In 1954 the loan was repaid to Sadlo by Hicks.

In 1948 Hicks borrowed $37,500 from Sadlo for use by the gambling partnership. The money was used in the "bankroll" of the gambling operation, the fund which assures ability to meet gambling losses. There is no evidence that Lansky participated in this loan. The loan was repaid by Hicks in 1952. Hicks never reported to the tax commission that either Sadlo or Lansky held any interest in the hotel corporation or in the gambling partnership.

The ultimate conclusion reached by the tax commission was that respondents Hicks and Jones were unsuitable persons to hold gambling licenses. Five reasons were assigned for this conclusion as to Hicks and three

reasons as to Jones. The reasons reflect the commission's standards of suitability, to which we have already referred. By specifying the manner in which Hicks and Jones had failed to measure up the commission has disclosed its measure to this court.

We shall consider each of the reasons, together with its factual support. It is apparent from the record, however, that the principal basis for the determination of unsuitability was the concealment from the tax commission of interests which should have been reported. As to Hicks it is stated "He conspired with citee, Clifford A. Jones, to violate the laws of the State of Nevada and the rules and regulations of the commission by protecting hidden interests in citee's gambling operation." Jones is charged with an identical conspiracy with Hicks.

With reference to the necessity to report, the pertinent statutes and rules in effect at the time of the citation are as follows (with emphasis supplied in each case) :

Section 10(c) of the gambling control act then in effect (sec. 3302.19 NCL 1943–1949 Supp.) provides for the filing of quarterly applications for the issuance or maintenance of gambling licenses and requires that the application shall "include the name of the proposed licensee, the location of his place or places of business; the gambling game or games to be operated; the names of all persons *directly or indirectly interested in the business* and the nature of such interest."

Commission Rule II 1. provides grounds for revocation or suspension of licenses. Subparagraph (a) reads, "The omission of the name of any person *financially participating in the business*, or the taking in of a new partner, or associate without the disclosing of the same to the Commission, accompanied by the requisite information concerning him and verified by him, shall be deemed pertinent under this paragraph."

Section 10ff of the statute (sec. 3302.22a NCL 1943–1949 Supp.) provides for hearings relative to revocation or suspension of licenses and states in part, "If upon

such hearing the commission shall be satisfied that the licensee has committed or knowingly permitted a violation of any of the provisions of this act, or rules and regulations, it shall have the power to revoke or suspend the license of such licensee summarily."

The commission's conclusions of law include those to the effect that "The investment of $160,000 by George Sadlo and Jack Lansky in Bonanza Hotel, Inc. to be used for the purpose of constructing hotel buildings wherein gambling was to be, and was, conducted, gave them and each of them an indirect and financially participating interest or share in the operation of citees' gambling establishment in the State of Nevada." Also that "The investment of $37,500 by George Sadlo in citees' gambling business for bankroll purposes gave him a direct and financially participating interest * * *." Also that "The individual interests of George Sadlo and Jack Lansky in citees' gambling operation was a material fact which was required by law to be reported by the citees to the commission."

Respondents contend that a financially participating interest should be one which gives the holder a right to share in the profits and operation of the gambling establishment; that only such an interest could reasonably be regarded as connected with gambling control. The commission contends that the loan of money itself gave Sadlo and Lansky a financially participating interest.

It is our view that the language "financially participating interest" should not be as narrowly defined as respondents would have it but may reasonably be construed to include the investment which results when money is lent for the purpose of financing an enterprise. Otherwise such financial interests as those represented by the corporate bonds of an incorporated licensee would be excluded. While these do not have the potentially hazardous effect upon the public welfare which direct operational control would have, still they can be said to be of material concern to the commission.

We turn first to the $160,000 loan.

Hicks testified that this was a personal loan to him. Many peculiar circumstances were connected with the loan. The explanations may well have appeared inadequate to the commission. Circumstances involving tampering with corporate records, the time and method of payment, the failure to produce evidence which should have been available, all might have led to an inference that Hicks and Jones were seeking to hide or misrepresent the facts. There was a newspaper report of an admission by Jones of a Lansky interest, which report was not met in a forthright manner by Jones as we shall later discuss. There is no question of the purpose for which the loan was made or of the use to which it was put. It directly benefited the hotel corporation. The device of a personal loan to avoid direct involvement in an enterprise, if held to be legally effective under circumstances such as these, could seriously hamper the commission's control over the qualifications of its applicants and licensees. Under the circumstances the commission was justified in concluding that the loan was in actual fact an investment in the hotel corporation. It may be said, then, that Sadlo and Lansky have been shown to have possessed a financially participating interest in the hotel corporation.

But is this an interest in the gambling operation? It is to be noted that the commission has not concluded that a direct interest in the gambling operation was given. It has limited its findings to an "investment * * * in Bonanza Hotel, Inc." from which it has concluded, as matter of law, that an indirect interest in the gambling partnership resulted. In support of its position it has made the following conclusion of law: "That the separate and individual entities of Thunderbird Hotel Company, a copartnership, and Bonanza Hotel, Inc., a corporation, should be disregarded and should be considered as merged into the one entity owned by citees and controlled and operated by citee Marion B. Hicks."

The theory of corporate entity is simply that a corporation possesses a legal entity apart from the people

who compose it. In a proper case the theory is disregarded when it serves as a shield against justice. The commission's position appears to be that the corporation was so closely related to the partnership that an interest in one was for all practical purposes an interest in the other.

There might be some practical merit in such a contention in the case of an interest which carries a measure of operational control. Such is not the case here. The interest was a mere financial investment. It was the corporation's obligation to repay which created the interest. The theory of corporate entity prevents that obligation from being transformed into a partnership obligation. If the partnership cannot be said to have been legally obligated to repay the debt it cannot be said that the loan constituted any kind of financially participating interest in the partnership. The commission erred as a matter of law in concluding that the corporate debt constituted a financially participating interest in the partnership.

This is not to say that the commission may not require such an interest in such a closely related enterprise to be reported. However, it has not made such a requirement. The Sadlo loan was not the only one which was taken by the hotel corporation for its construction of the hotel building. A substantial bank loan was taken. No question has been raised over the failure to report the bank loan. No suggestion is made that the bank thereby acquired a financially participating interest in the gambling operation. The bank itself might be somewhat startled to learn that such is the view of the commission. The fact would appear to be that the commission was concerned not so much with the nature of the interest as with the identity of those who had acquired it. In the case of the Lanskys any Nevada business activity at all would have been of interest to the commission.

But if wrongfulness is to attach to a failure to report, the duty to report must appear with reasonable clarity. Wrongfulness, such as is charged against Hicks and

Jones, cannot be established by showing a failure to report gratuitously that which is not required but which simply might have been expected to have been of interest to the commission.

We conclude that there is no evidence to support a finding of wrongful concealment of the $160,000 loan.

The $37,500 loan is troublesome from a different angle. This money was invested by Sadlo directly in the gambling operation itself. As such it constituted a financially participating interest and was reportable. Our difficulty is that it is impossible to determine from the record whether the commission, in its determination of unsuitability, has placed significance upon these facts standing alone.

It would appear that the commission's concern with a Sadlo interest was primarily that it led to a Lansky interest which latter was considered highly objectionable. There is no suggestion that Lansky was concerned with this loan. It would appear from the language used in stating the ground of unsuitability, which we have already quoted, that a mere failure to report was not regarded as sufficient to constitute unsuitability. The use of such terms as "conspired" and "hidden interests" indicate that an innocent failure to report was not regarded as material but that an intent deliberately to mislead the commission was regarded as material. Such an intent might well have been inferred as to the larger loan. However, the suspicious circumstances in connection with that loan, to which we have already referred, are lacking in this case.

On the other hand, other conclusions of the commission might be said to indicate that a knowing failure to report in and of itself was considered significant.

The record is susceptible of either one of two conclusions. It might be inferred that failure to report was innocently due to a belief that the Sadlo investment did not constitute a reportable interest. On the other hand, it might be presumed that Hicks had knowledge that the interest was reportable and that his failure to report was with knowledge and to that extent was willful.

As to this loan we conclude that there is evidence to support a conclusion that Hicks knowingly failed to report the Sadlo interest. There is no substantial evidence to support a conclusion that he willfully and deliberately acted to conceal the interest from the commission other than through a failure to report it. A determination as to the significance of these facts remains for the commission to make with clearer expression than is now to be found.

As to Jones there is no evidence that he knew of the $37,500 loan. If his knowledge is to be established by inference and his failure to report is to be held not innocent, the conclusion of a willful failure to report the interest is reached by mounting one inference upon another or an inference upon a presumption. It cannot be said that this constitutes substantial evidence.

As to Hicks, four other grounds of unsuitability have been specified. It is found that he attempted unlawfully to hypothecate capital stock of the Bonanza Hotel, Inc. It is admitted that he offered stock to Sadlo as security for the $160,000 loan which offer Sadlo rejected. Under commission rules existing at the time of the hearing such a hypothecation must have commission approval, which Hicks had not sought. This rule, however, was not in effect at the time the stock was offered to Sadlo. There is no evidence to support this ground.

It is further found that Hicks "became a business partner of George Sadlo who is known to him to be a person or an associate of persons involved in underworld activities and leaders of organized crime in the United States." The proof upon this finding is slight. Hicks denies any such partnership. Sadlo's Federal income tax returns, which were received in evidence by the commission, disclose in one year a report of a capital gain. This page of the return form contains a blank in which the names of the taxpayers are to be set forth. The names of George Sadlo and Marion Hicks were set forth. Respondents contend that this was obviously a stenographic error. The court below so regarded it. Hicks

failed to present any proof to this effect or to make any explanation whatsoever. We cannot say that a reasonable mind, in absence of proof one way or the other, could not infer that this was no error but constituted an accurate although gratuitous statement of the source of the capital gain. We conclude that there is support for this finding.

It is further found that Hicks "employed key personnel in the operation of citees' gambling business, knowing them to be former employees and associates of persons known to be leaders of organized crime in the United States." This is not denied and is amply supported by the record.

Finally it is found that Hicks' "association with George Sadlo on citees' gambling premises attracted undesirable underworld characters and leaders in organized and nation-wide crime to the State of Nevada." The record establishes that Sadlo's presence at the Thunderbird hotel attracted Jake Lansky (and, on rarer occasions, Meyer Lansky) to that hotel. It does not appear that Hicks' association with Sadlo, other than through permitting him to maintain residence at the hotel, had any bearing upon the matter. If Hicks is to be deemed unsuitable for the reason that he permitted Sadlo to maintain a room at the hotel, or for the reason that he simply associated with a man who had undesirable social or business connections, the finding should be more specific to this effect. We reserve judgment on the question whether such a ground of unsuitability can be said to be reasonably connected with gambling control. The finding, as stated, is not supported by the evidence.

As to Jones there are two remaining grounds of unsuitability. First, "He knew that said hidden-interest holders in citees' gambling establishment would attract undesirable underworld characters and leaders of organized and nation-wide crime to the State of Nevada." We have already concluded that there is no proof that Jones had knowledge of any hidden interest in the gambling operation. This finding falls with that of the protection of hidden interests.

The final ground for Jones' unsuitability is that "he refused to voluntarily disclose to the commission at an investigative hearing certain material evidence affecting his qualifications to hold a gambling license on the ground that such evidence was not required to be disclosed for the reason that it was a privileged communication between attorney and client when he knew that same was not properly classified as privileged." This ground, as we construe it, might be said to be that Jones, as a licensee, had not responded to commission inquiry in the forthright manner which the commission has every right to demand of its licensees or applicants.

The commission was faced with a report by a Clark County newspaper that Jones, as an attorney, had boasted to a prospective client that his influence with the tax commission was such that although the commission knew that the Lansky brothers held hidden interests in the Thunderbird hotel it took no action. The commission, at a preliminary investigative hearing, examined Jones as to the accuracy of the news report. Jones denied that the Lanskys held any hidden interest in the Thunderbird hotel, but refused to answer the commission's questions relative to his reported conversation upon the ground that any statements made by him would constitute a privileged communication between attorney and client. He suspected that his conversation had been recorded and demanded that the record first be played. He suspected that the "prospective client" was not such in fact, but was an employee of the newspaper seeking to discredit him politically. Until he could be sure of his relationship he stood upon privilege. No recording was ever produced. Four months later, at the show-cause hearing before the commission, he testified freely and denied all statements attributed to him. He explained that he had since learned that the prospective client was not such in fact and felt free to testify.

His conversation with the "prospective client," however, was not in confidence. A third person was present. Privilege, therefore, did not exist. See: 70 C.J. 433,

Witnesses sec. 583. Furthermore, Jones must have been thoroughly familiar with the statements attributed to him by the newspaper for it was upon that news report that the investigative hearing, in large part, was based. If the reported statements had not been made by him, he could have denied making them without violating any professional confidence. There is substantial evidence to support this ground.

We are faced once again with the necessity for respecting the limits of judicial participation in matters of gambling control. We have determined that while, in large part, the commission's assignments of unsuitability are not supported by the evidence, in other respects they are. Once again we note that it is not for the courts to fix the standards by which suitability is to be determined. It is not for us to hold that, upon those commission findings which are supported by substantial evidence, Hicks and Jones are or are not to be held suitable to hold gambling licenses. That determination remains for the tax commission to make.

However, some certainty should attach to the status of respondents by virtue of this judicial review and some stability should attach to our decision. Since what the commission has treated as the major offenses are without substantial evidentiary support, we feel that our proper course is to reverse the commission, accepting the apparent basis to be the true basis for its action. Our decision is without prejudice to the right of the commission, in any future proceedings it may choose to take (and in absence of waiver) to consider the status of respondents upon the basis of the offenses here established by evidence.

Upon the reversal of commission action, the court below is affirmed. The suspension order of the commission is hereby set aside.

BADT, C. J., and EATHER, J., concur.