MARGARET FLICK, THE CRUMMER CORP., R. E. CRUMMER, KENDRICK JOHNSON, ENID JOHNSON, DOROTHY C. CAFFREY, DR. AND MRS. E. S. D. MERCHANT, B. MENZI, WILLIAM KEITH SCOTT, KAROL KOCH, V. L. SMITH, L. V. REDFIELD, MR. AND MRS. VIRGIL SMITH, LESLIE FARETTO, ARNOLD S. PAGE, MR. AND MRS. H. H. HOLLOWAY, FREEMAN C. BURCHETTE, JOSEPH PATRUCCO, BARRETT P. LAUDER, R. L. KAIPER, O. F. KISTLER, GLEN H. FREY, MR. AND MRS. JOE B. FERETTO, MR. AND MRS. ROBERT SCHOUWEILER, ELI FRANCOVICH, HARRY T. ROGERS, FRANK W. GREEN, MR. AND MRS. ERIC JACKSON, DR. AND MRS. GEORGE FARRELL, MILTON F. STEARNS, MR. AND MRS. E. S. YOAKAM, W. E. LYNCH, MR. AND MRS. EMERY KERY, APPELLANTS, v. NEVADA FISH AND GAME COMMISSION, AND WASHOE COUNTY GAME BOARD, RESPONDENTS.

No. 4089

February 16, 1959                    335 P.2d 422

*Kendrick Johnson,* of Reno, for Appellants.

*Harvey Dickerson,* Attorney General, and *William N. Dunseath,* Chief Deputy Attorney General, both of Carson City, for Respondent Nevada Fish and Game Commission.

*A. D. Jensen,* District Attorney, of Reno, for Respondent Washoe County Game Board.

# OPINION

By the Court, BADT, J.:

This appeal challenges the constitutionality of the Fish and Game Act (NRS 501.010 et seq.). Margaret Flick and some 40 other plaintiffs sought an injunction restraining the Nevada Fish and Game Commission from opening to hunting a rural area outside the city limits of Reno within the southwest portion of the area known as the Truckee Meadows. In the general area upland game hunting is engaged in. The appeal is from a denial of the injunction sought.

Appellants assert that the act authorizes and sanctions an interference with and is a deprivation of the private ownership of property, that it authorizes hunters (under orders of the state board of fish and game commissioners opening sundry areas including privately owned, occupied and improved lands to hunting) to occupy and hunt upon such lands without the permission of the owners. Did the statute so provide, we should not hesitate to strike down the offending provisions as violative of section 1, art. I of the state constitution and the fourteenth amendment of the federal constitution. But nowhere in the act can be found any provision that expressly or by necessary implication authorizes a trespass of any nature upon the lands or possessions of appellants.

In brief the statute declares that wild game in the state not domesticated and in its natural habitat is part of the natural resources belonging to the people, that it is subject to the state's control including the fixing of open and closed seasons and the necessity for obtaining licenses. These are powers long recognized throughout the nation. The act creates a board of commissioners for the administration of its provisions, and such board, acting under authority of the act (NRS 501.345), designated as open to hunting the rural area above-mentioned and including the lands and improvements of the appellants. These lands vary in size from 1-acre tracts to ranches of from 100 to 200 acres. At the same time the

board closed to hunting other rural areas likewise containing privately owned lands. County boards may close areas within their respective counties. NRS 501.345. The administrators of the statute are expert and experienced in matters concerning wildlife and the record is devoid of anything showing that their actions or orders were arbitrary or capricious. See Nev. Tax Com. v. Hicks, 73 Nev. 115, 310 P.2d 852.

As to the insistence of appellants that the act, at least impliedly, authorizes hunting upon their lands without their consent we need only refer to NRS 503.240 making it unlawful to hunt on any enclosed private property where signs are displayed forbidding the same, declaring a violation to be a misdemeanor and providing penalties; and to NRS 503.250 declaring it unlawful to hunt upon occupied, cultivated and fenced property of another and likewise declaring a violation to be a misdemeanor and fixing penalties. These are sections of the fish and game law. Under the crimes and punishments act any willful entry upon another's land after a warning not to trespass is declared to be a misdemeanor, and the posting of "no trespass" signs in the manner provided is deemed to have given sufficient warning against trespass. NRS 207.200. Thus exclusive right to the possession of his land and complete control thereof to the exclusion of any right of another to enter upon it for hunting is vested in each of the appellants. Hamilton v. Williams, 145 Fla. 697, 200 So. 80.

Appellants further contend that as they are in a closely occupied rural or suburban area it is discriminating to open their area to hunting while closing the area within the limits of the city of Reno. It needs no discussion, however, to justify the conclusion that the patent difference between the two areas justifies such classification. Barker v. State Fish Commission, 88 Wash. 73, 152 P. 537, and cases therein cited.

The order and judgment of the district court refusing to enjoin the administrators of the state fish and game law from opening the area in question to hunting must be affirmed.

Though such affirmance disposes of the issues presented by this appeal, the record of the trial impels further comment. It is clear from that record that these appellants are exposed to an outrageous situation for which a remedy must be found. While the courts cannot supply that remedy they need not remain silent in the face of injustice and thus appear tacitly to approve the situation.

It appears that despite repeated, posted, published and personal warnings that no hunting was permitted on lands of appellants, hunters in absolute, arrogant and contemptuous disregard of the rights of the owners invaded their premises and recklessly discharged their shotguns at game virtually at their doorsteps.

One of the appellants, owner of a purebred Jersey dairy farm of 130 acres, testified to the killing by hunters of two purebred Jersey cows, of hunters shooting toward her house, of killing a pheasant on her lawn. "*　*　* The cars were lined up on either side of Holcomb Lane, and for some reason or other the cars on this side of the road shot across the road to the other side, and vice versa, so that you felt like a dispatch rider; the bullets would be going like this all across the road. They seemed to lose all sense of anything but the pheasant. Nothing else seems to occur to them in the way of human beings or animals. I have also stood in my front courtyard and had bullets go by me. This is about four yards from my front door."

Another of the appellants testified that as his daughter came out of the kitchen door, she heard a shot and birdshot dropped all around her. On another occasion two young men were hunting in the field containing cattle. When their attention was called to the fact that the land was posted, they were offended that they should be questioned and invited the witness to put them off. On another occasion a painter working on one of his cottages was forced to quit work by reason of shot falling close to him. The hunter shot a pheasant in his field. Birds were dropped on his land on other occasions.

Another witness testified to hunters shooting so close

that one could hear the shot hitting the roof and the windows, and that most of the hunters shot from the road, although some of them went through the fields. Another witness testified to having a stable window shot out, and that children and horses were endangered. The witness's two children, aged, respectively, 13 and 9, were riding horseback in a lane where the shooting took place. Another witness testified that, when he was cleaning out his spring, two hunters, seeing something moving in the willows and brush, took a pot shot at it—toward him. On one occasion shot rattled off the roof of a shed in which he was working. On another occasion "three kids about 16, 17 years old, along in there, ran around the house in full pursuit of a little family of quail. They were within ten feet of the house at the time, just blazing away at these quail." He said that all of his neighbors had similar experiences.

Another witness testified to having horses on the property, a dog and children, and that a hunter shot 10 or 12 times right by one of her houses. Another witness testified to hunters being in his driveway many times, jeopardizing the safety of his home and family. Another testified to shooting 40 feet from his neighbor's house, and that he and his wife, his cattle, horses and dogs were in jeopardy. It was stated that two persons were actually struck by pellets. All this occurred on posted property.

We have deliberately refrained from referring to these hunters as sportsmen. Wild-game hunting in America has become big business. Skill in hunting, marksmanship, training of dogs, the enjoyment of outdoor life, healthful exercise, good sport, the exercise of the traits of good sportsmanship, to say nothing of the preservation and scientific conservation of wildlife, all are things commanding a high degree of respectful consideration. When attempted to be exercised by people who respect neither gun, game, dog nor the rights of others, we deal with malefactors who should be treated as such. Someone should take away their guns. If this duty devolves upon citizens who merely want to enjoy their own property, it is not a healthy situation.

The problem appears to be two-fold: both legislative and administrative.

There are two other groups of property owners in the area thus opened to hunting, both of which groups want the area to remain open. One group (some 45 of them signed letters to this effect) want the right to hunt on their own property and to invite their friends in to hunt. Another group would have hunting permitted so that the game, mainly the pheasants, may be prevented from destroying their grain crops. It is said that these two groups outnumber the appellants who want the area closed to hunting.

Respondents did not see fit to refute any of the testimony referred to but restricted their defense to a showing (1) that other homeowners in the area desired to keep it open to hunting and (2) that the state game commissioners, the county game board and the county commissioners had held open meetings in the matter, and that their orders were not arbitrary. For the purposes of this opinion, therefore, the testimony adduced by appellants may be accepted as true.

A decision between the desires and needs of these opposing groups requires a legislative and not a judicial determination. Judgment of the county commissioners in this sphere is not reviewable by the courts.

Abuse of the hunting privilege and disregard of trespassing laws pose administrative problems of licensing and law enforcement. It is common knowledge that violations of the game laws (a shot after sunset, an unpunched deer tag, use of a shotgun capable of holding more than three shells, as well as the more flagrant violations) are vigorously prosecuted. This is as it should be. But preoccupation with this area of social offense, or even with the area of game conservation, is no justification for disregard of the fact that appropriate licensing procedures and strict law enforcement have become necessary for the protection of the public.

The excellent and faithful work of the administrative officers and personnel of the fish and game commissioners is well known to the citizens of the state, who

are cognizant of the vast store of knowledge of wildlife possessed, and the high degree of skill exercised by them in the protection, propagation and preservation of game. This must include, of course, the proper harvesting of game crops and the balancing of flocks and herds with available feed, forage and cover, and the research and field investigations involved. There should be noted also the constant admonitions of the game commission against hunting on private property without the consent of the owner. It is generally recognized too that our wildlife, thus preserved, is one of our great resources, affording recreation and the exercise of hunting and outdoor skills to a large proportion of our citizens, as well as attracting thousands of visitors annually. All this but emphasizes the necessity for protection against such depredations as have been suffered by these appellants.

With sympathetic appreciation of the nature of appellants' problem, we must refer them for remedy to the appropriate legislative and administrative authorities, or to the appropriate organs of public inquiry.

Affirmed.

MERRILL, C. J., and MCNAMEE, J., concur.