Jack K. BERMAN, Plaintiff,

v.

RIVERSIDE CASINO CORPORATION, H. J. Munley, Emmet Munley, William Miller, Defendants.

No. 1564.

United States District Court D. Nevada.

March 16, 1964.

Frank R. Petersen, Reno, Nev., James Martin MacInnis, and Jack K. Berman, San Francisco, Cal., for plaintiff.

Belford & Anglim, Reno, Nev., for defendant H. J. Munley.

THOMPSON, District Judge.

Defendant H. J. Munley, with consent of the Court responsive to the suggestion of the Court of Appeals for the Ninth Circuit (Berman v. Riverside Casino Corporation, 9 CCA 1963, 323 F.2d 977), has renewed his motion for summary judg-ment. A decision on the motion was reserved pending settlement of a Pre-Trial Conference Order, which was filed March 10, 1964.

The Circuit Court held that the facts alleged by plaintiff state a claim for relief against Riverside Casino Corporation, a Nevada corporation. The issue now is whether the relationship of defendant H. J. Munley to the corporation and to the transaction alleged in the Complaint on November 6, 1960 was such as to render him personally liable to plaintiff.

Munley avers, on the basis of the facts established without conflict by interrogatories, depositions and affidavits, that he is not personally liable, that there is no genuine issue of material fact respecting his personal liability, and that he is entitled to judgment as a matter of law.

The admitted facts respecting Munley's status in the corporation on November 6, 1960 are summarized in the Pre-Trial Conference Order as follows:

"1. At all times material hereto, defendant Riverside Casino Corporation was a corporation organized and existing under and by virtue of the laws of the State of Nevada, with its principal place of business in Reno, Nevada, and was the owner and operator of a gaming casino licensed by the State Gaming Control Board to conduct such enterprise in premises known as the Riverside Hotel in the City of Reno, County of Washoe, State of Nevada; plaintiff was and is a citizen of California, and the individual defendants were and are citizens of Nevada.

"2. On November 6, 1960, there were only four stockholders owning capital stock of defendant Riverside Casino Corporation, namely: H. J. Munley, Jack Douglas, Robert R. Franks and Samuel Levey, each of whom was licensed under the requirements of the Gaming Control Act of the State of Nevada as stockholders of Riverside Casino Corpora-

tion to conduct a licensed gaming business on said premises.

"3. On November 6, 1960, defendant H. J. Munley was the Secretary of Riverside Casino Corporation and was a stockholder and licensee, as aforesaid, owning of record fifteen per cent of the issued and outstanding capital stock of defendant Riverside Casino Corporation. In said capacities, H. J. Munley did not have or exercise any control or supervision of the management of the casino enterprise other or in addition to his rights as a stockholder granted by law.

"4. On October 23, 1960, defendant H. J. Munley had entered into a contract of sale with defendant William Miller whereby defendant H. J. Munley sold to William Miller said stock of the Riverside Casino Corporation in consideration of the payment to H. J. Munley of the sum of $25,000, said sale to be effective upon approval by the Nevada Gaming Commission of William Miller as a gaming licensee. The sale and transfer of the stock were consummated on November 21, 1960, and the purchase price therefor was paid by William Miller to H. J. Munley as follows: $6,000 in June, 1961; $6,000 in July, 1961; $6,000 in August, 1961; and $7,000 in September, 1961."

There is no dispute in the record with respect to the stated facts and they are supplemented by uncontroverted depositions and affidavits.

■ 1. Under Nevada law, a stockholder of a private corporation is not personally liable, solely by reason of his stock ownership, for the debts and obligations of the corporation. N.R.S. 78.-225; Nev.Const., Art. 8, Sec. 2; Seaborn v. Wingfield, 56 Nev. 260, 48 P.2d 881.

■ 2. Under Nevada law, the management and control of the affairs of a private corporation are vested in the board of directors, and a stockholder, as such, exercises his powers in the election of directors. N.R.S. 78.115, 78.120; Edwards v. Carson Water Co., 21 Nev. 469, 34 P. 381.

■ 3. Under Nevada law, a secretary or other officer of a private corporation has only the authority delegated to him by the by-laws and the board of directors and is not personally liable for the debts and liabilities of the corporation solely by reason of his occupancy of the office. State ex rel. Garaventa v. Garaventa L. & L. Co., 61 Nev. 110, 118 P.2d 703; N.R.S. 78.130; Swartout v. Grover Collins Drilling, etc., 75 Nev. 297, 339 P.2d 768; O'Connell v. Cox, 78 Nev. 40, 368 P.2d 761.

■ 4. Under Nevada law, a stockholder of a private corporation, which is licensed under the requirements of the Nevada Gaming Control Act to operate a casino, who is himself so licensed as a stockholder under the requirements of the Act, does not thereby incur personal liability for corporate obligations generated by the gaming operations.

Of the four propositions just stated, there is no real disagreement among the parties with respect to the first three. Munley was not present at the time of the transactions relied upon by plaintiff which occurred on November 6, 1960, and had no power of control or supervision over them as corporate stockholder or secretary. It is evident from the briefs and arguments of counsel and the admissions and statements at the Pre-Trial Conference that the assertion of personal liability against Munley is founded solely on the fact that he was then a licensee of the Riverside Casino Corporation licensed gaming enterprise. The resolution of this contention rests upon a determination of the intent of the Nevada Legislature in the enactment of the Nevada Gaming Control Act.

■ The rule of statutory interpretation in Nevada requires us to look to the four corners of the enrolled bill to determine legislative intent and we are entitled to no assistance from arguments, reports, committee hearings and like pro-

ceedings leading up to the adoption of the law. State ex rel. Bartlett v. Brodigan, 37 Nev. 245, 141 P. 988.

In 1955, the Legislature enacted a new and comprehensive Nevada Gaming Control Act (N.R.S. 463.010 et seq.) which was revised and amended in 1959. The portions of the Act pertinent to our inquiry are:

N.R.S. 463.020:

"1(o) 'License' or 'gaming license' means any license issued by the state or any political subdivision thereof pursuant to this chapter or chapter 464 of NRS which authorizes the person named therein to engage in gaming or pari-mutuel wagering.

"(p) 'Licensee' means any person to whom a valid gaming or pari-mutuel wagering license has been issued.

"(u) 'Person' means any corporation or association as well as a natural person."

N.R.S. 463.130:

"1. It is hereby declared to be the policy of this state that all establishments where gambling games are conducted or operated or where gambling devices are operated in the State of Nevada shall be licensed and controlled so as to better protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada.

"2. Any license issued pursuant to this chapter shall be deemed to be a revocable privilege and no holder thereof shall be deemed to have acquired any vested rights therein or thereunder."

N.R.S. 463.140:

"1. The provisions of this chapter with respect to state gaming licenses shall be administered by the state gaming control board and the Nevada gaming commission, which are hereby charged with administering the same for the protection of the public and in the public interest in

accordance with the policy of this state.

"2. The board shall investigate the qualifications of each applicant for licenses under this chapter before any license is issued and shall continue to observe the conduct of all licensees to the end that licenses shall not be issued to nor held by unqualified or disqualified persons or unsuitable persons or persons whose operations are conducted in an unsuitable manner or for unsuitable or prohibited places or locations. The board shall have full and absolute power and authority to recommend the denial of any application for license, or the limitation, conditioning or restriction of such license or the suspension or revocation of any license, for any cause deemed reasonable by the board. The commission shall have full and absolute power and authority to deny any application for license, or to limit, condition, restrict, revoke or suspend any license, for any cause deemed reasonable by the commission."

N.R.S. 463.150:

"1. The commission is empowered and shall, from time to time, adopt, amend or repeal such regulations, consistent with the policy, objects and purposes of this chapter as it may deem necessary or desirable in the public interest in carrying out the policy and provisions of this chapter.

"2. Such regulations may, without limiting the general powers herein conferred, include the following:

"(a) Prescribing the method and form of application which any applicant for a gaming license shall follow and complete prior to consideration of his application by the board.

"(b) Prescribing the information to be furnished by any applicant or licensee concerning such person's antecedents, habits, character, associates, criminal record, business ac-

tivities and financial affairs, past or present.

"(c) Requiring fingerprinting of an applicant or licensee or employee of a licensee or other methods of identification.

"(h) Prescribing under what conditions the nonpayment of a gambling debt by a licensee shall be deemed grounds for revocation or suspension of his license."

### N.R.S. 463.170:

"1. Any person who the commission shall determine is a suitable person to receive a license under the provisions of this chapter, having due consideration for the proper protection of the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada, may be issued a state gaming license. The burden of proving his qualification to receive or hold any license hereunder shall be at all times on the applicant or licensee.

"2. No corporation, limited partnership, business trust or organization or other association of a quasi-corporate character shall be eligible to receive or hold any license under this chapter unless all persons having any direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policy-making or supervisory, are individually qualified to be licensed under the provisions of this chapter."

### N.R.S. 463.200:

"1. Application for a state gaming license shall be made to the board on forms furnished by the board and in accordance with the regulations of the commission.

"2. The application shall include:

"(a) The name of the proposed licensee.

"(d) The names of all persons directly or indirectly interested in the business and the nature of such interest."

### N.R.S. 463.220:

"1. After final order approving an application, the board will issue to the applicant or applicants named, under the name or style therein designated, a certificate of eligibility for a state gaming license. The board may limit such certificate or place such conditions thereon as it may, in the public interest, deem necessary. The board may, by unanimous vote, and if satisfied of the necessity of such action, issue a probationary certificate. No certificate of eligibility shall be assigned either in whole or in part.

"2. After final order of the state gaming control board approving an application, the commission may, after considering the recommendation of the board, issue to the applicant or applicants named, under the name or style therein designated, a state gaming license, or deny the same. The commission may limit such license or place such conditions thereon as it may deem necessary in the public interest. The commission may, if satisfied of the necessity of such action, issue a probationary license. No state gaming license shall be assigned either in whole or in part."

### N.R.S. 463.290:

"Every licensee shall at all times maintain on file with the commission a current report, verified by the affidavit of the person or an officer of a corporation and every stockholder thereof, to whom the license is issued, which shall set forth such information as may be required by the regulations of the commission."

### N.R.S. 463.340:

"1. It shall be unlawful to conduct, carry on, operate, deal or allow to be conducted, carried on, operated or dealt any cheating or thieving game or device, or to deal, conduct, carry on, operate or expose for play any game or games played with cards, dice, or any mechanical de-

vice, or any combination of the same, which may have in any manner been marked or tampered with to deceive the public or equipped with electrical or any other device whatever which might render the game more liable to win or lose. The use of marked cards, loaded dice, plugged or tampered-with machines or devices to deceive the public is expressly made unlawful.

"2. Any violation of the provisions of this section shall be deemed a gross misdemeanor, and shall be punished by a fine of not less than $1,000, or by imprisonment in the county jail for not less than 6 months, or by both fine and imprisonment."

N.R.S. 463.360:

"1. Conviction by a court of competent jurisdiction of the violation of any of the provisions of this chapter may act as an immediate revocation of any and all licenses which may have been issued to the violator, an, in addition, the court may, upon application of the district attorney of the county or of the commission, order that no new or additional license under this chapter be issued to such violator, or be issued to any person for the room or premises in which such violation occurred, for a period of 1 year from the date of such revocation."

N.R.S. 465.100:

"Any proprietor or keeper of a gambling house who shall permit any minor to engage in any game in his gambling house, or who shall permit any minor to lounge or remain therein, shall be liable to the parent or guardian of such minor in damages, which may be collected by a civil action in a sum not less than $50 nor more than $1,000."

Regulations have been promulgated by the Nevada Gaming Commission which have the force and effect of law and which provide in part:

"4.030 APPLICATION AND FORMS. Application for a state gaming license shall be made to the board in accordance with the following:

"1. Prior to consideration of the application by the board, an applicant shall complete and file with the board such forms as may be required and provided by the board. The application shall include the full names and addresses of all persons directly or indirectly interested in the business for which the license is sought and the nature of such interest. Without limiting the generality of the foregoing, the following are deemed to have an interest in such business:

"(a) Any person having a right to share in the profits of such business, whether as an owner, assignee, landlord or otherwise.

"(b) Any person to whom any interest or share in the profits of such business has been pledged or hypothecated as security for a debt or deposited as security for the performance of any act, or to secure the performance of a contract of sale.

"2. In conjunction with the application for state gaming license, each individual named in an application for a nonrestricted license must complete and file a personal history record and an invested capital questionnaire, on forms to be supplied by the board.

"3. Each individual named in an application for license shall be fingerprinted and photographed in duplicate either by the board or an authorized law enforcement agency. Fingerprint impression cards may be obtained from the board or from any authorized law enforcement agency of the State of Nevada. The photographs must be satisfactory to the board and must have been taken not earlier than 3 months before the date of filing the application.

"4. An applicant and every individual named in an application, as

well as all corporate officers and members of the board of directors, shall, immediately upon request, furnish to the board or the commission such other information as the board or the commission may require.

"4.040 Separate applications for each establishment. A separate application is required for each establishment for which a license is sought, irrespective of the ownership of such establishment.

"4.080 Corporate applicants. Any corporation which is an applicant for a state gaming license or which is named in any such application, shall furnish proof satisfactory to the commission and the board that such corporation has complied with all laws of this state relating to qualification to do business in this state and that it has complied with all applicable federal and state laws and rules or regulations pertaining to the issuance and sale of corporate securities. No such application will be considered by the board until all proof has been furnished to it.

"5.010. Methods of operation.

"1. It is the policy of the commission and the board to require that all establishments wherein gaming is conducted in this state be operated in a manner suitable to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada.

"2. Responsibility for the employment and maintenance of suitable methods of operation rests with the licensee, and willful or persistent use or toleration of methods of operation deemed unsuitable will constitute grounds for license revocation.

"3. The commission and the board deem that any activity on the part of a licensee, his agents or employees which is inimicable to the public health, safety, morals, good order and general welfare of the people of the State of Nevada or which would reflect or tend to reflect dis-credit upon the State of Nevada or the gaming industry is an unsuitable manner of operation. Without limiting the generality of the foregoing, the following acts or omissions may be deemed unsuitable manners of operation:

\* \* \* \* \* \*

"(i) Possessing or permitting to remain in or upon any licensed premises any cards, dice, mechanical device or any other cheating device whatever, the use of which is prohibited by statute or ordinance.

"5.030 Violation of law or regulations. Violation of any provision of the Nevada Gaming Control Act or of these regulations by a licensee, his agent or employee shall be deemed contrary to the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and grounds for suspension or revocation of a license. Acceptance of a state gaming license or renewal thereof by a licensee constitutes an agreement on the part of the licensee to be bound by all of the regulations of the commission as the same now are or may hereafter be amended or promulgated. It is the responsibility of the licensee to keep himself informed of the content of all such regulations, and ignorance thereof will not excuse violations.

"8.100 Extent of participation permitted.

"1. Pending final action on the application of a proposed transferee to be permitted to acquire an interest in the licensed games or establishment, the existing licensee or licensees will be held responsible for the conduct of the licensed games or establishment, for all license fees payable, and for all acts or omissions of proposed transferees participating in the operation."

■ Plaintiff argues that the effect of the gaming laws and regulations is to impose on every individual who is named on a corporate gambling license personal

liability for obligations incurred in the conduct of the games. In support of this contention, plaintiff relies primarily upon N.R.S. 463.170, supra, 463.340, supra, and Regulation 5.010(2), supra. We do not agree.

It is self-evident from a reading of the statutes and regulations that their intent is to establish comprehensive safeguards for the control of licensed gambling, and that they do not purport to deal with the civil liability of persons participating. The only statute imposing civil liability (N.R.S. 465.100) has been on the books since 1897 and is not part of the Gaming Control Act.

■ A corporation is a "person" and "licensee" under the terms of the Act (N.R.S. 463.020, supra), and is treated differently from a natural person as an applicant and licensee only in that "all persons having any direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policymaking or supervisory" must be "individually qualified to be licensed." Under the law and regulations as quoted and as administered by the Nevada Gaming Commission and Nevada Gaming Control Board, a gambling license for a corporation is issued to and in the name of the corporation and there are included on the license the names of all persons who have also qualified as individuals because of their direct or indirect interest. We find nothing in this to justify disregard of the corporation as a juridical person and to subject all persons having a direct or indirect interest therein to liability for corporate acts in the operation of the games. The true intent of the Legislature was merely to attempt to eliminate undesirables from participation in licensed gambling.

Should we accept plaintiff's view that the mere naming of a person on a license as one "having any direct or indirect interest" subjects him to civil liability arising from misconduct of the games, it would mean that a host of persons who have no legal control over the operation whatsoever would be so liable. These might include creditors (Nev. Tax Comm. v. Hicks, 73 Nev. 115, 310 P.2d 852), an assignee of profits (Reg. 4.030), a pledgee of profits (idem), a landlord or lessor (idem), an owner of an interest in the premises (Reg. 3.020), a mortgagee or holder of other security against the premises (idem), a pledgee of corporate stock (idem). Such an extensive vicarious liability for the conduct of others should have a more explicit foundation than a licensing law regulating a business affecting public morals and general welfare. We note that in the Hicks case, supra, the Nevada Supreme Court, under the predecessor of the present Gaming Control Act, did not see fit to disregard the corporate entity as "a legal entity apart from the people who compose it" in a situation where the issue was whether there was an undisclosed indirect financial interest which justified revocation of the gaming license. How much less reason is there to abolish established principles governing personal liability for corporate acts in order to subject a corporate stockholder to liability merely because he has qualified for inclusion in the corporation's gaming license.

■ The statute (N.R.S. 463.340) declaring it a gross misdemeanor to conduct or operate or allow to be conducted or operated a cheating game does not aid plaintiff. In Nevada Tax Comm. v. Mackie, 75 Nev. 6, 333 P.2d 985, the Nevada Supreme Court, while sustaining revocation of a gaming license where cheating occurred on the premises without the knowledge or permission of the licensees, was careful to point out that lack of proof of personal complicity on the part of the licensees "might well serve to protect * * * (them) * * * against any criminal charge of cheating." To the extent that any such criminal statute may be a predicate for civil liability (see Fischman v. Raytheon Mfg. Co. [2 CCA 1951], 188 F.2d 783), responsibility for the tortious misconduct will be only in those persons contemplated by the statute, to wit, those persons who "conduct, carry on, operate, deal or allow to be conducted, carried on, operated or dealt any cheating or

thieving game or device." 1 Am.Jur. 2d, Sec. 73, pp. 601–602. As implied by the Supreme Court in its caveat in the Mackie decision, knowledge and control are the minimum requirements for the imposition of liability, civil or criminal, under such a statute. People v. Conness, 150 Cal. 114, 88 P. 821; Luckie v. Diamond Coal Co., 41 Cal.App. 468, 183 P. 178; Markus v. Justice's Court, 117 Cal.App.2d 391, 255 P.2d 883; People v. Forbath, 5 Cal.App.2d Supp. 767, 42 P.2d 108. In the instant case, the alleged cheating game was conducted and operated by defendant Riverside Casino Corporation, and the control and knowledge of H. J. Munley in the premises are expressly denied, without dispute in the affidavits and depositions. He cannot be deemed in law to have allowed such a cheating game, assuming its occurrence.

In the area of licensed lawfulness of table games, Nevada is an oasis, although many states, including California, obtain much more revenue from other forms of legalized gambling, such as betting on horse and dog races, than does Nevada from its casinos and slot machines. There is, as a consequence, a dearth of collateral precedent bearing on the issues here. We do, however, note certain decisions which tend to the result we have reached in this case.

Under a Minnesota statute which prohibited gambling and declared it a crime to run a game or bet on it or for a person to suffer a gaming table to be used in a building owned or occupied by him, and which also created a civil remedy for recovery of money lost or paid to the winner, the Court, in Nagle v. Randall (1911), 115 Minn. 235, 132 N.W. 266, not only rejected the contention that the owner and lessee were personally liable, but also refused to hold the operator himself liable for money lost at poker where all he got was a rakeoff from each game.

In Marine & Fire Ins. Bank v. Megar, 1 Dudley's Reports, 83 (Ga.1832), one of three alleged co-partners conducting an illegal faro game was held not liable for money had and received because he was not present partaking in the game and had received none of the money won. In Aiello v. Queens Co. Jockey Club, 208 Misc. 445, 144 N.Y.S.2d 322 (1955), the Court denied recovery under an express statute creating a cause of action for money lost at gambling because another statute licensed and legalized pari-mutuel betting on horse races, and said: "The right of recovery is purely statutory and should be restricted to the extent and area clearly defined by law."

In Federkowitz v. Holoweak, 168 N.Y. S. 4 (Sup.1918), a statutory action for money lost at gambling, the judgment against defendant was reversed because he did not participate in the game and received no money, although he owned the saloon. In Gillespie v. Schomaker (E.D. Ky.1961), 191 F.Supp. 8, a statutory action for recovery of gambling losses was dismissed as to the owners of the premises where the gambling occurred because, as such, they were not identified as the "winners" under the statute. In Wright v. Stewart (D.C.Mo.1904), 130 F. 905; 8 Cir., 147 F. 321, the president and cashier of a bank were held personally liable for a confidence game only because they knew of the fraudulent conspiracy and performed positive acts in furtherance of it. See also: Hobbs v. Boatright (1906), 195 Mo. 693, 93 S.W. 934, 5 L.R.A.,N.S., 906; 39 A.L.R.2d 1221.

We find no issue of material fact with respect to the personal liability of defendant H. J. Munley in the circumstances related in the Complaint, as they have been defined and clarified by the affidavits, depositions and Pre-Trial Conference. He is entitled to judgment as a matter of law.

### JUDGMENT

IT IS ORDERED ADJUDGED AND DECREED:

That plaintiff take nothing by this action as against defendant H. J. Munley, and that the action be, and it hereby is, dismissed as to said defendant, and that said defendant have judgment against plaintiff for his costs herein incurred.