Chief Judge Desmond (dissenting).
The court is holding that there is no public policy against the use of a New York court as a collection agency by a gambling house proprietor who is guilty of the social wrong of letting his customers gamble on a charge account basis. This comes as a surprise in a State where the professional gambler has always been treated as an outlaw and a gambling house considered as a criminal nuisance (People ex rel. Collins v. McLaughlin, 128 App. Div. 599, app. dsmd. 194 N. Y. 556; People v. Stedeker, 175 N. Y. 57, 62; Watts v. Malatesta, 262 N. Y. 80, 82). Such has been the public policy of New York since colonial days and we are not informed as to when or how it was changed.
Plaintiff, a Delaware corporation and operator of a Comm on - wealth-licensed gambling room or casino in its hotel in Puerto Rico, sued defendant, a New York resident, on a $3,000 check and 13 “I. O. U.s ” totaling $9,000. The $12,000 total covered defendant’s gambling losses at plaintiff’s casino where defendant had been allowed to gamble on credit. The trial court sitting without a jury gave judgment for plaintiff but the Appellate Division, reversing, held that such a loan is not collectible in the courts of New York.
The issue: are our courts open to suits by gambling house proprietors who let their customers run up debts; or do such transactions so offend our concept of good morals that our settled public policy prompts us to reject the suit? Closing our doors to such a lawsuit is in principle and under our *18 decisions and statutes the only possible course. It is not a matter of choice of law as between the Puerto Rican and domestic brands. We refuse the suit not because Puerto Rico’s law differs from ours but because we cannot in good conscience use our judicial processes to recognize the gamester’s claim by giving him a judgment (Mertz v. Mertz, 271 N. Y. 466; Flegenheimer v. Brogan, 284 N. Y. 268; Hollis v. Drew Theol. Seminary, 95 N. Y. 166; Cross v. United States Trust Co., 131 N. Y. 330, 343). “It is an attribute of our State’s sovereignty that it may determine for itself whether under its concepts of comity a particular foreign law should or should not be enforced ” (City of Philadelphia v. Cohen, 11 N Y 2d 401, 406, cert. den. 371 U. S. 934).
We are here asked to enforce a gambling contract, unenforcible at common law (Ruckman v. Pitcher, 1 N. Y. 392; Meech v. Stoner, 19 N. Y. 26; Irwin v. Williar, 110 U. S. 499, 510) and made void and illegal in our State (and almost every other State, see Irwin v. Williar, supra) under specific statutes (Penal Law, §§ 991-996). In truth, not one but two public policies of ours are offended when we give judgment for plaintiff. First, operating a gambling business (as distinguished from casual betting between individuals) was an indictable public nuisance at common law, has always been held criminal conduct in New York State, and professional gamblers are “ outlaws ” in New York (People v. Stedeker, 175 N. Y. 57, 62, supra; People v. Bright, 203 N. Y. 73; Watts v. Malatesta, 262 N. Y. 80, supra; Bamman v. Erickson, 288 N. Y. 133; People v. Goldstein, 295 N. Y. 61; Hofferman v. Simmons, 290 N. Y. 449). Second, from earliest times in this State all gambling contracts and loans for gambling have been void and denied enforcement by the professional gambler even to the extent that the bettor-customer may sue for the amount he lost (Penal Law, § 994; Watts v. Malatesta, supra). As this court said in the Watts case in 1933 (p. 82): “ The reason seems obvious. Curb the professional with his constant offer of temptation coupled with ready opportunity, and you have to a large extent controlled the evil.” It denies both history and logic to hold that despite all these showings of public policy our courts must give this plaintiff judgment.
*19 The conclusion that settled New York policy bars suit on a claim like this one is not disproved by pointing to our legalization of bingo games and pari-mutuel betting on horse races (N. Y. Const., art. I, § 9). The people of the State in amending their Constitution and the legislators in adopting and revising the statutes have found and acted on important differences between those two forms of gambling and the operation of gambling houses. That these differences are widely recognized elsewhere is evident from the fact that while pari-mutuel betting is lawful in 24 States and bingo is legalized in 11 States (lottery in one) nevertheless only one State (Nevada) licenses gambling rooms and even in Nevada gambling-house debts are not suable in court (Nevada Tax Comm. v. Hicks, 73 Nev. 115). California courts will not recognize Nevada gambling contracts (Hamilton v. Abadjian, 30 Cal. 2d 49). The only New York State appellate decision cited contra is Thatcher v. Morris (11 N. Y. 437) which discussed an out-of-State lottery conducted not as a business but for educational, religious and benevolent purposes.
Some of our citizens fail to appreciate these differences and believe that all kinds of gambling should be licit or all forms condemned. But the preference of the majority (who make public policy in a government like ours) has been expressed at the voting booths and in the Legislature with the result that now, as during the State’s whole history, the operation of a gambling casino is a criminal offense and loans by the operator to his customer or bets made on credit are uncollectible. This is our historical and settled State policy and it is totally inconsistent with that policy to say that the courts provided by and for our citizens must nonetheless give judgment on any gaming house owner’s claim against his customer.
The judgment should be affirmed, with costs.
Judges Dye, Fuld, Scileppi and Bergan concur with Judge Burke; Chief Judge Desmond dissents in an opinion in which Judge Van Voorhis concurs.
Judgment of Appellate Division reversed and that of the Supreme Court, New York County, reinstated, with costs in this court and in the Appellate Division.