(No. 33236.—■)
THE PEOPLE *ex rel.* John Gutknecht, State's Attorney, Appellant, *vs.* THE CITY OF CHICAGO *et al.,* Appellees.

*Opinion filed September 23, 1954.*

540

JOHN GUTKNECHT, State's Attorney, of Chicago, (GORDON B. NASH, and JAMES C. MURRAY, of counsel,) for appellant.

JOHN J. MORTIMER, Corporation Counsel, and WILLIAM H. DILLON, both of Chicago, (MAYNARD I. WISHNER, and LOUIS BACON, of counsel,) for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This case presents constitutional issues arising out of the most recent effort of the State to deal with the problem of urban slums and blighted areas. The Urban Community Conservation Act was adopted by the General Assembly in 1953. It aims at the prevention of slums by the creation of Municipal Community Conservation Boards which are authorized to take steps designed to prevent the spread of slum and blight to new areas. Such a board was appointed for the city of Chicago, and the city council appropriated funds for its use. The validity of the act was challenged upon numerous constitutional grounds in this *quo warranto* action instituted by the People on the relation of the State's Attorney of Cook County. The defendants, the city of Chicago, its mayor, and the members of the Conservation Board of the city of Chicago, filed a motion to dismiss the complaint which was sustained by the circuit court of Cook County. This direct appeal followed.

The act (Ill. Rev. Stat. 1953, chap. 67½, pars. 91.8-91.16,) is concerned with deteriorating urban areas, called

conservation areas, which are likely to become slum and blighted areas if their deterioration is not arrested. It describes such areas, provides for the appointment of municipal community conservation boards, and authorizes the boards to designate particular localities as conservation areas. Following the designation of a conservation area the board is authorized, after investigation and hearings, to adopt a conservation plan for the area embodying the steps required to prevent its transition into a slum. The board is authorized to nominate, for appointment by the presiding officer of the municipality, the members of a conservation community council, composed of residents of the area for each conservation area, whose duty it is to assist in the formulation of the area's conservation plan.

An area conservation plan may include, but is not limited to the following matters: (1) land uses, residential and nonresidential; (2) improvement, alteration, or vacation of major and minor streets and alleys, provision for restricted service access, and off-street parking; (3) locations and easements for public utilities; (4) community facilities; (5) landscaping and site engineering; (6) building restrictions; (7) recommended construction including new buildings, rehabalitation and conversions, demolition of designated structures, and elimination of nonconforming uses; (8) population density, ground coverage, and number of dwelling units recommended; (9) recommended standards of maintenance, and requirements of applicable health and safety ordinances; (10) zoning and/or rezoning required; (11) costs and financing arrangements of public portions of the plan. The plan is required to conform to the comprehensive plan, if any, of the municipality. Ill. Rev. Stat. 1953, chap. 67½, par. 91.12.

After the conservation plan for an area has been approved by the board and by a majority vote of the community council concerned, it is to be submitted to the governing body of the municipality for adoption or rejec-

tion. If the plan is adopted, the board is authorized to acquire by purchase, condemnation or otherwise, any property the acquisition of which is necessary or appropriate for the implementation of the plan, to demolish or remove buildings from the property so acquired and to sell, lease or exchange such property. Ill. Rev. Stat. 1953, chap. 67½, par. 91.13.

Section 7 of the act provides that if, after notice to parties in interest and an opportunity to be heard, an owner of property within the area fails to make such property comply with the minimum standards of applicable municipal ordinances, the board is authorized to apply to the circuit court for an order permitting the corporate authorities to make the necessary repairs, and to collect from the owners the cost of eliminating violations of the ordinances. The cost is made a lien upon the property, subordinate to prior liens, and enforceable by foreclosure as in the case of mortgages or mechanics' liens. Ill. Rev. Stat. 1953, chap. 67½, par. 91.14.

The act is first attacked upon the ground that it authorizes the taking of private property for a private use in violation of section 13 of article II of our constitution. On this point, the act contains an explicit finding and declaration of public policy by the General Assembly that there exist in many urban communities, areas which are "rapidly deteriorating and declining in desirability as residential communities and may soon become slum and blighted areas if their decline is not checked." It is further found and declared that the existence of these areas is detrimental to the health, safety, morals and welfare of the public, and that the prevention of slums is a public use essential to the public interest. (Ill. Rev. Stat. 1953, chap. 67½, par. 91.9.) The weight to be accorded such a legislative declaration has frequently been pointed out. *Cremer* v. *Peoria Housing Authority,* 399 Ill. 579, 588; *People* v. *Chicago Transit Authority,* 392 Ill. 77, 86; *Peo-*

*ple ex rel. Greening* v. *Bartholf*, 388 Ill. 445, 451; *Hagler* v. *Small*, 307 Ill. 460, 474.

The legislative declaration is buttressed by the Economic Report of the President of the United States, submitted to the Congress on January 28, 1954, which stated: "A successful fight against blight can be waged in these cities only if it is planned and carried forward on a basis sufficiently broad to improve the character of a whole neighborhood. * * In some cases, urban blight can be corrected only by the total clearance of an area and its subsequent redevelopment; more frequently, however, the need is for selective demolition and rehabilitation, thus conserving and renewing what is still useful in older neighborhoods." Title III of the recently enacted Federal Housing Act of 1954 makes available grants in aid from the United States to cities not only to eliminate existing slums and blighted areas but also to prevent new slums and blighted areas. Public Law 560, 42 U.S.C.A. 1401 *et seq.*

Plaintiff does not undertake to dispute the existence of the factual relationship between the prevention of slums and the public welfare upon the basis of which the General Assembly and the Congress have acted. Rather the argument is that because the act contemplates that properties acquired through the use of eminent domain may be sold or leased for private development, in accordance with the provisions of the conservation plan, the public purpose of the taking is nullified. It is said that in order to constitute a public use the contemplated improvement "must be one which the public to some extent have a right to use and not one which is merely a benefit to the public." *Town of Kingston* v. *Anderson*, 300 Ill. 577; *Gaylord* v. *Sanitary District of Chicago*, 204 Ill. 576.

The sweeping expressions in the cases relied upon, however, have been restricted to the particular factual situations there involved by our decision in *People ex rel. Tuohy* v. *City of Chicago*, 394 Ill. 477. Numerous decisions of this

court clearly demonstrate that possessory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain. In discussing a similar contention advanced in an attack upon the validity of the Neighborhood Redevelopment Corporation Law, the court said: "When such areas have been reclaimed and the redevelopment achieved, the public purpose has been fully accomplished. The fact that the act does not thereafter vouchsafe the continued use of the property acquired for public purposes, does not in any way affect the purposes of the act or render the taking of the property a taking for a use or purpose which is not public. The achievement of the redevelopment of slum and blight areas, as defined in the act, in our opinion constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved." *Zurn* v. *City of Chicago*, 389 Ill. 114, 129. See also, *Chicago Land Clearance Com.* v. *White*, 2 Ill. 2d 216; *People ex rel. Gutknecht* v. *City of Chicago*, 414 Ill. 600, 611; *Chicago Land Clearance Com.* v. *White*, 411 Ill. 310, 316; *Cremer* v. *Peoria Housing Authority*, 399 Ill. 579, 589, 590; *People ex rel. Tuohy* v. *City of Chicago*, 394 Ill. 477, 487.

It is also contended that the "line of demarcation between a public and private use in the employment of eminent domain to eliminate slum areas * * * must be the elimination rather than the prevention of slums." But we are aware of no constitutional principle which paralyzes the power of government to deal with an evil until it has reached its maximum development. Nor is there force in the argument that if the use of eminent domain in the prevention of slums is permitted "every piece of property within the city or State can be condemned to prevent it from becoming a slum." Legitimate use of governmental power is not prohibited because of the possibility that the power may be abused.

In our opinion, the act does not violate section 13 of article II of the constitution.

Plaintiff also challenges the act as an unconstitutional delegation of legislative power to the Community Conservation Board of Chicago and upon the ground that it is so incomplete, indefinite and uncertain as to violate due process. The attack here centers upon the provisions relating to the designation of conservation areas and to the formulation of plans for particular conservation areas. Defendants suggest, and we agree, that what is here involved is not, technically speaking, a delegation of legislative authority. The action of the board in designating a conservation area carries with it no legal consequences until a conservation plan for the area becomes effective. And a plan approved by the board does not become effective until it is adopted by the city council. The critical action, which affects the rights of property owners, is thus legislative rather than administrative action. (*Cf. Berry* v. *City of Chicago,* 320 Ill. 536, 541.) In this respect the status and functions of the board resemble those of a board of local improvements, a zoning commission or a planning commission. (Ill. Rev. Stat. 1953, chap. 24, pars. 84-6, 73-2, 53-1; cf. *Gray* v. *W. A. Black Co.* 338 Ill. 488, at 495.) The objection made, however, may fairly be treated in this *quo warranto* action as a challenge to the legal existence of the board and its authority to act, upon the ground that the statute fails to describe its duties with sufficient particularity. This objection and the due process objection based upon the asserted indefiniteness and lack of certainty of the statute will be discussed together.

The act defines a "Conservation Area" as "an area of not less than 160 acres in which the structures in 50 per cent or more of the area are residential having an average age of thirty-five years or more. Such an area is not yet a slum or blighted area as defined in the Blighted Areas Redevelopment Act of 1947, but such area by reason of

dilapidation, obsolescence, deterioration or illegal use of individual structures, overcrowding of structures and community facilities, conversion of residential units into nonresidential use, deleterious land use or layout, decline of physical maintenance, lack of community planning, or any combination of these factors may become such a slum and blighted area." (Ill. Rev. Stat. 1953, chap. 67½, par. 91.10.) Such areas, and their effect upon the public welfare, are thus described in the legislative declaration of policy: "* * * these conservation areas are rapidly deteriorating and declining in desirability as residential communities and may soon become slum and blighted areas if their decline is not checked; that the stable economic and physical development of these areas is endangered by the presence of blighting factors as manifested by progressive and advanced deterioration of structures, by the overuse of housing and other facilities, by a lack of physical maintenance of existing structures, by obsolete and inadequate community facilities and a lack of sound community planning; that as a result and concomitant of the decline of conservation areas, there is a growth of delinquency, crime, and of housing and zoning law violations in such areas, together with an abnormal exodus of families; ·that the decline of these areas threatens to impair the tax base of such communities and produce the conditions characteristic of slum and blighted areas which threaten the health, safety, morals, and welfare of the public; that in order to promote and protect the health, safety, morals and welfare of the public it is necessary to provide for the protection of such conservation areas and prevent their deterioration into slum and blighted areas." Ill. Rev. Stat. 1953, chap. 67½, par. 91.9.

It is apparent that the legislative definition attempts to identify and isolate the physical factors which characterize those residential parts of a city which are in an intermediate, transitional stage,—not soundly capable of resist-

ing potential deterioration, but not yet slum areas, either. The task is difficult. The requirements of the definition as to the size of an area and as to the age of the residential structures in it are specific. A floor is provided by the definition of a slum or blighted area which is incorporated by reference from the Blighted Areas Redevelopment Act of 1947, a definition which has been sustained against attack for want of sufficiently specific standards. (*People* v. *City of Chicago,* 414 Ill. 600, 614, 615; cf. *Zurn* v. *City of Chicago,* 389 Ill. 114, 133; *Belovsky* v. *Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 Atl. 2d 277; *Opinion to the Governor,* 69 Atl. 2d (R.I.) 531; *Foeller* v. *Housing Authority of Portland,* 256 Pac. 2d (Ore.) 752.) Beyond this, the definition enumerates various blighting factors which may combine to constitute an existing threat of transition into a slum. It does so, in our opinion, with sufficient clarity in view of the subject matter involved. (*Cf. Department of Public Works and Buildings* v. *Lanter,* 413 Ill. 581, 590.) Specific degrees of deterioration or dilapidation, precise percentages of obsolescence, or mathematical measurements of the extent of overcrowding of residences and of schools and other community facilities which indicate imminent deterioration cannot be stated, for the combinations which will produce the condition at which the legislation is aimed are highly variable.

Plaintiff argues, however, that the provisions which authorize the board to designate a conservation area are insufficient in that the board is permitted to designate at its will as a conservation area, "every residential section of a community over thirty-five years old and in which the city has failed or refused to enforce its zoning laws or building codes." The statute does not reasonably admit of this construction. From section 3 it is clear that mere age of structures in the area is not conclusive but that in addition, there must be present in the area at the time it is

designated a conservation area, the various blighting factors enumerated in the definition, or a combination of them, to such an extent that unless the decline is checked the area may soon become a slum.

Section 5 provides that a conservation plan "may include but is not limited to (1) land uses, residential and non-residential; (2) improvement, alteration, or vacation of major and minor streets and alleys, provision for restricted service access, and off-street parking; (3) locations and easements for public utilities; (4) community facilities; (5) landscaping and site engineering; (6) building restrictions; (7) recommended construction including new buildings, rehabilitation and conversions, demolition of designated structures, and elimination of non-conforming uses; (8) population density, ground coverage, and number of dwelling units recommended; (9) recommended standards of maintenance, and requirements of applicable health and safety ordinances; (10) zoning and/or rezoning required; (11) costs and financing arrangements of public portions of the plan; (12) recommended time table of various stages of the program; (13) any and all other steps neded to carry out the plan. Such plan shall conform to the comprehensive plan, if any, of the municipality." Upon the approval of a plan by the board and by the conservation community council for the area in question, the plan is to be submitted to the governing body of the municipality for adoption or rejection. Only upon adoption by the city council would a plan approved by the Chicago Area Conservation Board become effective, and only then would the board be authorized to take any steps toward implementation of the plan. If the action taken by said council in adopting a conservation plan be deemed unreasonable, oppressive, capricious or discriminatory, resort to the courts is available. *Murphy* v. *Chicago, Rock Island and Pacific Railway Co.* 247 Ill. 614, 618; *City of Chicago* v. *Brown,* 205 Ill. 568, 569.

It is also argued that the present act is so dependent upon other laws for an understanding of its provisions as to be invalid. It is pointed out that in order to determine whether an area can be designated a conservation area under section 3, the Blighted Areas Redevelopment Act of 1947 must be examined; that section 4 permits a member of a conservation board to also act as a member of a Redevelopment Commission created under the Neighborhood Redevelopment Conservation Law; that section 7 requires owners of property within conservation areas to make their property conform to "minimum standards as set forth in the governing ordinances of the municipality," and that one of the reasons specified by section 3 for designating a conservation area is "illegal use of individual structures." The legislative technique here employed is a familiar one, which has uniformly been held free from constitutional objection. (*Zurich General Accident and Liability Ins. Co. v. Industrial Com.* 331 Ill. 576, 580; *Zeman v. Dolan,* 279 Ill. 295, 298, 299; *People ex rel. Cant v. Crossley,* 261 Ill. Ill. 78, 85.) Where portions of one statute are adopted by reference in another, the effect is the same as though the statute or the provision adopted had been incorporated bodily into the act. (*People v. Crossley,* 261 Ill. 78.) It does not follow that because the statute refers to and adopts parts of other statutes it thereby amends them in violation of section 13 of article IV of the constitution. *Zeman v. Dolan,* 279 Ill. 295.

The statute is not open to the objection that it improperly delegates legislative authority, nor are its provisions so indefinite as to violate due process.

Plaintiff also argues that the present act includes subjects not contained in its title, in violation of section 13 of article IV. This constitutional provision, repeatedly construed, prohibits the inclusion of more than one subject within an act, and requires that the subject be expressed in the title. The title of this act is "An Act in relation to the

conservation of urban residential areas and the prevention of slums and to define the rights, powers and duties of municipalities in connection therewith." Plaintiff asserts that the challenged statute includes provisions for (1) condemnation (sec. 6); (2) zoning (sec. 5); (3) making repairs on residential structures by the municipality (sec. 6); (4) the creation and foreclosure of a lien (sec. 7.) The argument advanced is that although the general purpose of the act is to conserve residential areas and to prevent them from becoming slums, there is nothing in the title to indicate an intention to deal with zoning regulations, the repair of dilapidated or hazardous buildings, or the exercise of eminent domain. We disagree, and are of the opinion that each of these matters is germane to the prevention of slum and blighted areas.

The contention that the statute violates section 13 of article IV has no legitmate basis.

The next contention requiring consideration is that the act creates arbitrary classifications of real estate in violation of section 2 of article II of our constitution and the fourteenth amendment to the Federal constitution. An owner of property in a conservation area is required to comply with a conservation plan. His property may be taken by eminent domain or a lien may be imposed upon it to bring it up to minimum standards. Plaintiff insists that no reasonable basis exists for imposing these requirements upon owners of property in conservation areas and not upon those who live beyond such areas. He argues that if a residence in a conservation area tends to create slum conditions by failing to comply with a conservation plan or with minimum standards, a similar residence outside a conservation area would have the same tendency.

An act is not local or special because it operates in but one place, or upon a particular class of persons or things, provided there is a reasonable basis for the legislative classification. (*People* v. *City of Chicago,* 349 Ill. 304,

323.) The issue, then, is whether or not there is a legitimate basis for a classification which distinguishes between property within conservation areas and other property. The prevention of slum and blighted areas is a public use and a public purpose. The legislature has found that the conditions which it seeks to remedy exist upon an area basis rather than upon the basis of individual structures. It is not suggested that this finding does not accord with the facts. Legislative action taken to meet the evil in the form in which it most clearly exists cannot be said to be either clearly unreasonable or palpably arbitrary. (*Gill* v. *Boston Store of Chicago, Inc.* 337 Ill. 70, 82.) This conclusion is in accord with the slum clearance cases of *Foeller* v. *Housing Authority of Portland,* 198 Ore. 205, 256 Pac. 2d 752, 778, and *Herzinger* v. *Mayor and City Council of Baltimore,* (Md.) 98 Atl. 2d 87, 94, where like contentions were decided adversely.

The challenged classification is based upon a reasonable and substantial difference in situations bearing a proper relation to the purposes to be attained by the statute.

Finally, plaintiff contends that section 7, which makes the cost of necessary repairs a lien upon the property, authorizes the taking of property without just compensation in contravention of section 13 of article II of our constitution. The trial judge found that section 7 was separable from and could have no effect upon the validity of the rest of the act, and that a decision upon its constitutionality would be premature. Plaintiff directs attention to an allegation in the complaint that those defendants who are members of the Conservation Board of Chicago, "have undertaken to exercise and intend to continue to exercise the powers" conferred upon them by statute and ordinance, and asserts that defendants' motion to strike admitted this allegation. This allegation did not, we think, require the trial judge to pass upon the validity of section 7. The complaint alleges specific action under the statute and

the ordinances relative to the creation and appointment of a Conservation Board and the appropriation by the city of funds for its use, conformably to the act and the appropriation ordinance. It does not charge that the corporate authorities of any municipality have applied to a circuit court for an order permitting them to make improved private property .within a conservation area conform to the minimum standards set forth in the governing ordinances of the municipality and to charge and collect from the owners of and persons interested in the property the reasonable cost and expense of making the repairs and improvements necessary to bring the property up to the minimum standards of the ordinance. In the absence of such allegations, the trial judge did not err in refraining from determining the validity of section 7, which we agree is clearly separable from the other provisions of the act.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*