URBAN RENEWAL AGENCY OF THE CITY OF RENO, NEVADA, a Public Corporation, the CITY OF RENO, a Municipal Corporation, Et Al., Appellants, v. JOHN IACOMETTI and MARIA ANGELINA IACOMETTI, His Wife, Et Al., Respondents.

No. 4555

March 11, 1963                                    379 P.2d 466

[Rehearing denied April 3, 1963]

*Cooke & Roberts,* of Reno; *Roy Lee Torvinen,* City Attorney, City of Reno, and *Richard Breitwieser,* Assistant City Attorney, for Appellants.

*Streeter, Sala & Richards; Lohse & Fry; John S. Halley; Guild, Busey & Guild* and *Howard Cunningham; Emile J. Gezelin; Sidney W. Robinson;* all of Reno, for Respondents.

## OPINION

By the Court, THOMPSON, J.:

This case involves the Urban Renewal Law, NRS 279.010–279.380. It is here upon appeal from a judgment of the district court which dismissed, after trial, multiple condemnation actions instituted by the Urban Renewal Agency of the City of Reno.

In broad outline the Urban Renewal Law concerns "slum" and "blighted" areas which were found to be a menace to public health, safety, morals and welfare, contribute to the spread of disease and crime, impose onerous municipal burdens which decrease the tax base and reduce tax revenues, impair the sound growth of municipalities, retard the provision for housing accommodations and aggravate traffic problems. The elimination of these areas by acquisition, clearance and

disposition, or their reclamation by conservation and rehabilitation was declared to be a public use essential to the public interest.

In the fall of 1956 the Reno city council appropriated $9,000 for use by the Regional Planning Commission in making a preliminary survey of the City of Reno to ascertain if there existed an area, or areas, which would qualify as an urban renewal project area under federal law. The survey was initially directed to an area of about 400 acres located in the northeast section of the city.

The results of the survey conducted by the Regional Planning Commission were discussed with the city council. In February 1957 the council, by resolution (which was re-adopted June 10, 1957) declared the area surveyed to be an area of slum and blight and appropriate for an urban renewal project, and authorized the submission of an application to the Federal Housing and Home Finance Agency (HHFA) for an advance of funds for survey and plans for such project. Concurrently the city urged the state legislature to enact urban renewal legislation. The legislature did so, approving the Urban Renewal Law on March 29, 1957. The law did not prescribe an effective date, and thus became effective July 1, 1957. NRS 218.530.

On June 10, 1957 (after the enactment of the Urban Renewal Law, but before its effective date) the city council created an Urban Renewal Agency (URA). On July 8, 1957, after the effective date of the act, the council appointed the first board of commissioners of the URA, (NRS 279.370), and appropriated money for its use. Federal funds for survey and planning were received and a detailed study undertaken of a project area comprising about 99.10 acres.[1] That study, to which we shall later make more detailed reference, resulted in the "Final Project Report, Northeast Project Area, Project No. Nevada R–2," and was submitted to the city council at a public hearing on September 28, 1959. NRS 279.270 (3). The council approved the report, found the

[1] The HHFA believed the 400-acre area, for which survey funds were originally requested, too ambitious.

project area to be a combination of slum and blight, and adopted an urban renewal plan for its rehabilitation and redevelopment. Thereafter, the federal government committed itself to the loan and grant of large sums of money to be used for land acquisition in the project area. Through December 31, 1960, $646,392.74 had been spent on the project. Since that date, and prior to the trial of this case, further sums were expended in the acquisition of parcels and the clearance of structures. The URA net project cost estimate is approximately $1,824,350 of which the federal government is expected to provide $1,216,233.32 in the form of a capital grant, leaving a balance of $608,116.68 to be provided by local grants-in-aid.

The assigned errors and extensive briefing require our determination of the following basic problems. First, the scope of review by the trial court, i.e., in determining whether the project area was an area of slum and blight within the meaning of the Urban Renewal Law, is that court limited to a consideration of the information presented to the city council as of September 28, 1959 (when that body approved the project report and found the area to qualify), or may it conduct, in effect, a trial de novo in making such determination? The URA contends that the trial court was limited in its judicial review of the city council's action to the sole question of whether that body abused its discretion, or acted arbitrarily, or capriciously, or in bad faith, in the light of the information presented to it. On the other hand, the respondent property owners insist that the trial de novo conducted by the court was within its province, and that the findings made by that court upon conflicting evidence may not be disturbed by us. Second, whether the creation of the URA by the city council after enactment of the Urban Renewal Law, but before its effective date, renders unlawful all actions of the commissioners of that agency who were appointed after the effective date of the Urban Renewal Law. Third, whether the Urban Renewal Law is constitutional.[2]

---

[2]Many other points were separately briefed and argued. However, we believe that all of them are embraced within the three basic questions mentioned.

1. *Scope of trial court review.* The district court conducted a trial de novo. It made its own determination as to whether a portion of the project area could qualify as either a blighted area or a slum area within the Urban Renewal Law. It should not have done so. Its function was limited to a review of the record of information presented to the city council from the fall of 1956 to September 28, 1959 (the date of the public hearing at which the council approved the project report and found the area to qualify). Nevada has recognized this principle for years in varying circumstances. We have not distinguished between the scope of trial court review of a formal hearing by a governmental body, Nevada Tax Commission v. Hicks, 73 Nev. 115, 310 P.2d 852;[3] its review of such body's determination made after investigation and a public hearing, McKenzie v. Shelly, 77 Nev. 237, 362 P.2d 268; and its review of a governmental body's discretionary ruling made after investigation and inquiry, but without a formal hearing or a public hearing, Douglas County Board of County Commissioners v. Pederson, 78 Nev. 106, 369 P.2d 669. In each instance the court's inquiry is limited to the record of information presented to the governmental body. The court's purpose is to ascertain whether, upon such information, that body acted arbitrarily, capriciously, and abused its discretion.[4] Thus, a trial court should sustain discretionary action of a governmental body, absent an abuse thereof, to the same extent that an appellate court upholds the discretionary action of a trial court. McKenzie v. Shelly, supra. In Nevada Tax Commission v. Hicks, 73 Nev. 115, 123, 310 P.2d 852, 856, we said, inter alia, "Trial de novo, in effect, could relegate the commission

---

[3] A formal hearing in the sense of receiving the sworn testimony of witnesses in response to counsel interrogation, reporting and transcribing the same.

[4] In McKenzie v. Shelly, supra, and Douglas County Board of County Commissioners v. Pederson, supra, the determination of the governmental body was ultimately sustained. On the other hand, in City of Henderson v. Henderson Auto Wrecking, 77 Nev. 118, 359 P.2d 743 and Nevada Tax Commission v. Hicks, supra, its decision was overruled. However, in each instance the scope and purpose of judicial review was the same.

hearing to a meaningless, formal, preliminary and place upon the courts the full administrative burden of factual determination." It is primarily for this reason that the scope of judicial review has been thus confined.

Indeed, the proper trial court function in the instant case is not dissimilar to the function of this court where a review of action by a governmental body is sought by an original proceeding here. Oliver v. Spitz, 76 Nev. 5, 348 P.2d 158 (mandamus); Richardson v. Board of Regents, 70 Nev. 347, 269 P.2d 265 (certiorari); Boswell v. Board of Medical Examiners, 72 Nev. 20, 293 P.2d 424 (prohibition); Van Heukelom v. Nevada State Board of Chiropractic Examiners, 67 Nev. 649, 224 P.2d 313 (prohibition). In either instance, the reviewing court focuses its attention upon the information presented to the governmental body whose decision is questioned.

Though the scope of judicial review of action by a governmental body is limited in most cases, the respondents suggest that no such limitation exists where the power of eminent domain is employed. They argue that the issues of public use and necessity permit a full scale judicial review without limitation or restriction of any nature, i.e., a trial de novo as to such issues, thus requiring the trial court to decide whether areas of slum and blight exist, and a public necessity obtains for their eradication, citing Offen v. City of Topeka, 186 Kan. 389, 350 P.2d 33; Hogue v. Port of Seattle, 54 Wash.2d 799, 341 P.2d 171; Bristol Redevelopment & Housing Authority v. Denton, 198 Va. 171, 93 S.E.2d 288. The scope of review was not an issue in Offen, for there the appeal was from an order overruling the defendants' demurrer to plaintiffs' complaint. In Hogue the Washington constitution permitted a de novo trial on the question of public use in a condemnation suit. The constitution of Nevada does not contain a similar provision. The Bristol case does support the respondents' position, but is contra to the weight of authority.

The Nevada legislature declared that the powers conferred by the Urban Renewal Law "are for public uses and purposes for which public money may be expended

and the power of eminent domain and police power exercised, and that the necessity in the public interest for the provisions herein enacted is hereby declared as a matter of legislative determination." NRS 279.230 (3). In Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27, 37, the constitutionality of the District of Columbia Redevelopment Act was before the court. That act proposed the redevelopment of substandard housing and blighted areas, and delegated to an agency the power to acquire property by eminent domain and effect redevelopment. A unanimous court held the act constitutional. With reference to the legislative declaration of public purpose, use and necessity, the court said: "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia, [citations] or the States legislating concerning local affairs. [citations] This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one. [citations]." Accord: People v. City of Chicago, 3 Ill.2d 539, 121 N.E.2d 791; Kaskel v. Impellitteri, 306 N.Y. 73, 115 N.E.2d 659; cases collected in Annot., 44 A.L.R.2d 1414.

Involvement of the power of eminent domain does not, as respondents contend, serve to enlarge the scope of judicial review of action by a governmental body in an urban renewal case.

Indeed, the extremely narrow role of the courts in determining the issues of public use and necessity in condemnation cases has long been recognized in Nevada. The 1876 case of Dayton Mining Co. v. Seawell, 11 Nev. 394, recognized that, though the legislative declaration of public use may not be final, a court must pay it proper deference and, if a doubt exists, the legislative

declaration shall prevail. In Goldfield Consolidated Mining Co. v. The Old Sandstorm Annex Gold Mining Co., 38 Nev. 426, 438, 150 P. 313, 316, the court appears to have almost denied judicial review of the public use issue, for it said: "Public use is in every case a matter of local policy." Similarly, with reference to the issue of necessity, in Schrader v. District Court, 58 Nev. 188, 195, 73 P.2d 493, 495, it is said: "When the use is public, the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance." However, the more recent case of Aeroville Corp. v. Lincoln Power District, 71 Nev. 320, 290 P.2d 970, does not deny judicial review of the issue of necessity, as did Schrader; rather, it limits such review. In Aeroville, a condemnation suit, we held the expediency or necessity for a particular public improvement (relocation of a power line) to be a political rather than a judicial question, the determination of which was within the discretion of the agency to which the legislature had delegated authority. The court there refused to overrule the agency determination because its exercise of discretion was not shown to have been abused. In our view the principle enunciated in Aeroville has application here. In deciding whether an area of slum and blight existed, and a necessity for its elimination was present, the lower court was limited to a review of the information presented to the city council to whom the legislature had delegated the authority to make such determinations.

The record before us presents an anomaly. The district court, contrary to established law, permitted a trial de novo. However, in doing so, it arbitrarily confined its consideration to 32.34 of the 99.10 acres included within the project area, thereby committing additional error. The city council's finding of slum and blight blanketed the total area. The urban renewal project which it approved embraced 99.10 acres, not 32.34. The eradication of slum and blight in the "clearance" area (32.34 acres) was to be accomplished by acquisition, clearance and disposition. As to the balance, the "rehabilitation" area (67.76 acres), conservation

by rehabilitation was planned. The URA and the city council evaluated the area as a whole. The choice of area, its boundaries, the inclusion of particular parcels to complete an integrated plan are all matters resting within the discretion of the agency and municipality in which the legislature has vested that discretion. NRS 279.270; Berman v. Parker, supra; Kaskel v. Impellitteri, supra; Annot., 44 A.L.R.2d 1414, 1439. Once it has been determined that the designation of a particular project area is valid, the court should not consider the taking or leaving of sound buildings within its periphery. As stated in Berman v. Parker, 348 U.S. 26, 35, 75 S.Ct. 98, 104, 99 L.Ed. 27, 39, "Property may of course be taken for this redevelopment which, standing by itself, is innocuous and unoffending."[5]

Where the validity of an urban renewal project is questioned by those opposing condemnation of some included parcels, the judicial inquiry is much broader in scope than the particular controversy before the court. The total project, as distinguished from the isolated parcels sought to be condemned, is the focal point of review. A consideration of less than the complete plan is not warranted.

With the governing principles of review in mind, we turn to consider the information upon which the city council approved and authorized an urban renewal plan for the 99.10 acre project area in question.

The plan presented to the city council by the URA is comprehensive in scope. Its duration is 30 years. It

---

[5]Though the respondents acknowledge the validity of the "area as a whole" concept, they argue that two complete areas are involved here, a "clearance" area and a "rehabilitation" area. Hence, the trial court in limiting its consideration to the "clearance" area did not violate the "area as a whole" concept. Without question, error occurred, for the project area embraced both. NRS 279.210 permits clearance *and* rehabilitation to be included within a single urban renewal plan.

contemplates the elimination of the density and over-
crowding of structures within the "clearance" area;
the eradication of detrimental mixed land uses, narrow
congested streets and obsolete buildings not suitable
for rehabilitation or conversion. Displaced families are
to be relocated. The properties to be acquired within
the project area are to be disposed of for re-use by
private enterprise in accordance with the plan and
relevant laws. Re-zoning, new streets, sewers and storm
drainage are included among its objectives. Approxi-
mately two years of investigation, inquiry, surveying,
mapping, photography, inspection and personal contact
preceded its preparation and submission to the city
council. The services of multiple agencies and personnel
were utilized.[6] Their combined study reveals that within
the "clearance" area alone 60 percent of the buildings
are "substandard," because of age, obsolescence, lack
of adequate sanitation. Significant blighting environ-
mental influences within that area also obtain: improper
setbacks, alley dwellings, narrow streets, misaligned
intersections, multiple family use of single residences,
and the absence of parks and playgrounds. Though
the trial court harbored a different view as to whether
60 percent of the buildings within the "clearance"
area were substandard,[7] there is no dispute in the
record as to the additional blighting influences just
mentioned. It is apparent to us that the trial court

---

[6]Regional Planning Commission, URA staff, University of Nevada
sociology department, City of Reno building inspector's office, FHA
housing administration inspectors, Western Real Estate Research
of Chicago, Wilsey & Ham planning consultants, Housing and Home
Finance Administration.

[7]The court in Kaskel v. Impellitteri, 306 N.Y. 73, 115 N.E.2d
659, 661, commented, "Of course, none of the buildings are as
noisome or dilapidated as those described in Dickens' novels or
Thomas Burke's 'Limehouse' stories of the London slums of other
days, but there is ample in this record to justify the determination
of the city planning commission that a substantial part of the area
is 'substandard and insanitary' by modern tests, and that the whole
6.32 acres, taken together, may reasonably be considered a single
'area' for clearance and redevelopment purposes."

simply preferred its opinion to that of the public officials, and substituted it accordingly.[8]

We conclude: first, that judicial review in this case is limited to a consideration of the information presented to the city council from the fall of 1956 to September 28, 1959 (the date of the municipality's approval of project report and its finding that the project area qualified under the Urban Renewal Law) ; second, that the qualification of that area under the Urban Renewal Law must be evaluated as a whole; third, that the record of information presented to the city council contains substantial evidence upon which that body properly could find the project area in question to qualify under the Urban Renewal Law; and that its approval of the proposed plan was not arbitrary and capricious and did not constitute an abuse of discretion.

2. *The existence of the URA.* The lawful existence of the URA was never challenged in the court below. No issue was presented for determination in this regard.[9] Yet, that court decided that the agency was

---

[8]Respondents contend that the city council, in violation of NRS 279.360(2), delegated to the URA the power to determine whether the project area was a slum and blighted area. This contention is not sound. The record shows that the council made such determination, based upon information presented to it by the URA and other investigative agencies. Indeed, the council's original finding of slum and blight occurred in February 1957 following a preliminary survey by the regional planning commission. That finding was reaffirmed by the council on June 10, 1957. Final approval of the urban renewal plan was on September 28, 1959, at which time the council again found the project area to be an area of slum and blight. Throughout the entire period the council was informed of the results of the investigations being conducted. Some of the councilmen had personal knowledge of the project area.

[9]It is doubtful whether the respondents would have standing to raise the question *assuming* the de facto corporate existence of the URA. The existence of a public de facto corporation can be challenged only by the state. Tulare Irrigation District v. Shepard, 185 U.S. 1, 22 S.Ct. 531, 46 L.Ed. 773 ; Shapleigh v. San Angelo, 167 U.S. 646, 17 S.Ct. 957, 42 L.Ed. 310 ; Rhyne, Municipal Law, p. 25.

not lawfully created and that all of its activities were of no consequence and void. In the initial phase of this opinion we referred to the chronology. After legislative approval of the Urban Renewal Law, but before its effective date, the city council on June 10, 1957, passed a resolution purporting to create the URA. However, the commissioners to man the agency were not appointed until July 8, 1957, after the Urban Renewal Law was in effect. The lower court seized upon the anticipatory resolution of June 10 and pronounced it to be totally ineffective to "create" the URA.

The URA was created by legislative act, and not by city council resolution. NRS 279.370 states: "There is hereby created in each municipality a public body corporate and politic to be known as the urban renewal agency of the municipality * * * ." Thus, on July 1, 1957, the effective date of the law, the structure of the public corporation was in existence by virtue of the law itself. There remained only the task of implementation by the appointment of commissioners. This was accomplished by the city council on July 8, 1957. The URA thereafter functioned as a public corporation. It has entered into numerous contracts, supervised and participated in all activities concerned with the project area, acquired many parcels of property, and spent in excess of one million dollars in the process. We find no merit in the lower court's conclusion that the URA never came into being.

3. *Constitutionality.* The district court did not hold the Urban Renewal Law unconstitutional. Rather, by dictum, it declared the contrary. On appeal the issue of constitutionality was raised, briefed and argued. In view of our disagreement with the lower court on the questions already discussed, we must dispose of this issue as well.

The thrust of the respondents' contention is that Art. 1, §§ 1 and 8 of the Nevada Constitution are violated

because the Urban Renewal Law authorizes the taking of private property from one individual and its transfer to another for private as distinguished from public purposes. The same argument was presented to, and rejected by, the United States Supreme Court, with reference to the federal constitution in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 103, 99 L.Ed. 27, 38. The court there said, "Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. [citations] Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. [citations] The public end may be as well or better service through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." We adopt the same reasoning in answer to the respondents' argument that the Urban Renewal Law violates the Nevada constitution. Possessory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain. People v. City of Chicago, 3 Ill.2d 539, 121 N.E.2d 791. Case authority overwhelmingly supports this position. Annot., 44 A.L.R.2d 1414.

It is suggested that the statutory definitions of "slum" (NRS 279.190) and "blight" (NRS 279.050) do not

sufficiently specify standards by which it can be found that a menace to public health, safety, or morals exists. For want of such specific standards, the constitutionality of the Urban Renewal Law is further challenged. We reject such argument. The blighting factors, and the slum factors, which may in combination produce an area of slum and blight are listed. Specific degrees of deterioration, precise percentage of obsolescence, and mathematical measurements of the extent of over-crowding, etc., cannot be stated, for the combinations which will produce the condition at which the legislation is aimed, are highly variable. In view of the subject matter involved, it cannot be said that the provisions of the Urban Renewal Law in this respect are so indefinite as to violate due process. Nor is it required (as the trial court apparently assumed) that independent proof of detriment to public health, safety or morals be made. Once it is found that an area of slum and blight exists, and such finding rests upon evidence of substance, the consequent menace to public health, safety and morals, follows as a matter of legislative determination. NRS 279.230(3); cf. Oliver v. City of Clairton, 374 Pa. 333, 98 A.2d 47. We hold that the Urban Renewal Law does not violate any constitutional provision.

4. *Conclusion.* The legislature acted within constitutional limits in enacting the Urban Renewal Law. The statutory scheme has been followed. The renewal activities appear to have been well coordinated. The plan recommended by the URA and adopted by the city council has made, and proposes to make, reasonable use of available techniques, including city planning, public housing, total clearance, conservation and rehabilitation. The rights of the respondents will be constitutionally satisfied when they receive just compensation for their properties. Accordingly, we reverse the judgment below, and remand for trial addressed to the sole question of

determining the value of (NRS 37.110) and just compensation for (Art. 1, § 8, Nev. Const.; Virginia and Truckee R.R. Co. v. Henry, 8 Nev. 165) the properties sought to be condemned.[10]

BADT, C. J., and McNAMEE, J., concur.

[10]Though market value is a measure of just compensation, it is not the sole measure. Market value may, or may not, amount to just compensation. In Virginia and Truckee R.R. Co. v. Henry, supra, it is said, inter alia: "Upon this language, although the words 'compensation' and 'damages' are used, of course in the received and construed sense, petitioner insists that the measure thereof is filled by giving the private person the market value of the land taken. If such was the intention of the legislature, apt language has not been chosen to express it; and if such language had been used as of necessity clearly expressed such intention, then the act in that regard would have been opposed to the constitutional provision of the United States and of this State forbidding the taking of private property for public use without 'just compensation,' and not only so but to the practice either of written or unwritten law of every civilized people. Upon principle and precedent the proposition is monstrous. While the law does and should provide in proper case for the surrender to the public use of individual property, so that no stay shall impede the general necessity, on the other hand it must jealously guard the rights of individual owners. They are never to be remitted, as counsel suggests, to litigation for all matter of loss save the naked market value of the property taken, but no part of their property shall be taken without just compensation 'first made or secured.' It is difficult to imagine an unjust compensation; but the word 'just' is used evidently to intensify the meaning of the word 'compensation;' to convey the idea that the equivalent to be rendered for property taken shall be real, substantial, full, ample; and no legislature can diminish by one jot the rotund expression of the constitution. So are all the decided cases."